UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ELAINE CASE, *as Administratrix of the Estate of* KASEEM J. PANKEY,

                                        Plaintiff,

          -against-

ADRIAN H. ANDERSON, *individually and in his official capacity as Sheriff of the County of Dutchess*; JOHN DOE (1) and RICHARD ROE (1), Deputy Sheriffs of the County of Dutchess; THE COUNTY OF DUTCHESS; RONALD J. SPERO, *individually and in his official capacity as Chief of the Town of Poughkeepsie Police Department*, JOHN DOE (2) and RICHARD ROE (2), Police Officers in the Town of Poughkeepsie Police Department; TOWN OF POUGHKEEPSIE; JOHN DOE (3) and RICHARD ROE (3), Police Officers and/or Dispatchers in the City of Poughkeepsie Police Department; WESTCHESTER MEDICAL CENTER HEALTH CARE CORPORATION, *doing business as*, WESTCHESTER MEDICAL CENTER, *through its subsidiary*, THE MIDHUDSON REGIONAL HOSPITAL OF WESTCHESTER MEDICAL CENTER; and CORRECTIONAL MEDICAL CARE, INC.,

                                        Defendants.

No. 16 Civ. 983 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

      This case concerns the events surrounding the pre-trial detainment and eventual suicide

of Mr. Kaseem J. Pankey, who was admitted to and escaped from a mental health facility at The

MidHudson Regional Hospital of Westchester Medical Center (the "Hospital"), later arrested by

police officers from the City of Poughkeepsie (the "City") pursuant to an outstanding criminal

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/25/2017

warrant previously issued by the Town of Poughkeepsie (the "Town"), thereafter transferred to the custody of the Town and arraigned on the warrant, and held at the County of Dutchess (the "County") jail for two days until his death on November 26, 2014. Plaintiff Elaine Case, grandmother to the deceased and administratrix of his estate, alleges that during these events Mr. Pankey was subjected to negligence and deprivations of his Fourteenth Amendment Due Process rights in violation of 42 U.S.C. § 1983.

On behalf of Mr. Pankey's estate, Plaintiff brings this action against the County, the County Sheriff Adrian H. Anderson ("Sheriff Anderson"), Deputy Sheriffs for the County John Doe (1) and Richard Roe (1) (the "County Deputies"); Correctional Medical Care, Inc. ("CMC"); the Town, the Town Chief of Police Ronald J. Spero ("Chief Spero"), Town Officers John Doe (2) and Richard Roe (2) (the "Town Officers"); the City, Police Officers and/or Dispatchers in the City Police Department John Doe (3) and Richard Roe (3) (the "City Officers"); and Westchester Medical Center Health Care Corporation, doing business as Westchester Medical Center through its subsidiary the Hospital, for the alleged violations of state and federal law. All Defendants have moved to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(6) or 12(c). Plaintiff has cross-moved to amend the operative complaint in order to specifically allege claims against the City Officers.[1]

For the following reasons, Plaintiff's motion to amend is GRANTED and Defendants' motions to dismiss are GRANTED in part and DENIED in part.

---

[1] As part of Plaintiff's opposition to the City's motion to dismiss, she indicated she was withdrawing her claims against Chief Knapp of the City of Poughkeepsie Police Department and the City, but she has since clarified that she continues to assert negligence claims against the City despite withdrawing her federal claims. (*See* Letter from Counsel for Plaintiff dated Oct. 19, 2016 ("Plaintiff [] requests that the arguments contained in her Memorandum in support of her negligence claims against the City Police Officers also be read in support of her negligence claim against the City under the doctrine of *respondeat superior*."), ECF No. 94.)

## BACKGROUND

### I.  Factual Allegations[2]

Over the span of less than a week, Kaseem J. Pankey was, as Plaintiff alleges, negligently allowed to leave the Hospital and subjected to additional negligence and deliberate indifference to his mental health problems as he was shuffled between various law enforcement agencies.

#### a.  Admitted to the Hospital

On November 20, 2014, Mr. Pankey was admitted to Defendant Hospital's facilities as a psychiatric patient.  (PAC ¶ 23.)  At that time, he was accompanied by City of Poughkeepsie police officers (*id.* ¶ 53) and his grandmother, Plaintiff Elaine Case—who informed the Hospital of her relationship to Mr. Pankey and that he lived with her, and provided the Hospital with her contact information (*id.* ¶ 24).  This was not the first time Mr. Pankey had been admitted to the Hospital as a psychiatric patient or that they were informed of his familial and living relationship with Mrs. Case.  (*Id.* ¶ 25.)

After he was admitted, the Hospital's mental health treatment unit diagnosed him with, among other disorders, suicidal behavior and psychosis, and provided him with medication.  (*Id.* ¶¶ 26-27.)  At this time, he expressed to Hospital staff members that he sought protection from "devils and their demons."  (*Id.* ¶ 28.)  On the same day as his admission to the Hospital, the staff determined he required inpatient mental health stabilization.  (*Id.* ¶ 30.)

---

[2]  The following facts are taken from Plaintiffs' proposed third amended complaint (ECF No. 86, Ex. A) ("PAC").  *See Polanco v. NCO Portfolio Mgmt., Inc.*, 23 F. Supp. 3d 363, 366 n.1 (S.D.N.Y. 2014) (Freeman, J.) (accepting facts alleged in proposed amended complaint as true for the purposes of deciding a motion to amend).  Many of the allegations contained therein are made "upon information and belief," which is still permissible post-*Iqbal* to the extent they are not conclusory or speculative.  *See New York v. United Parcel Serv., Inc.*, 131 F. Supp. 3d 132, 137 (S.D.N.Y. 2015) (quoting *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)) ("A plaintiff may plead facts alleged upon information and belief 'where the facts are peculiarly within the possession and control of the defendant.'").

Over the course of the next two days, Mr. Pankey was agitated and disruptive during meals, refused the medication provided for him, and shouted at staff members. (*Id.* ¶¶ 31-32.) He stated his belief that he was being held hostage and made frequent requests to leave the facility. (*Id.* ¶ 32.) The staff determined he was "disorganized, delusional, and in need of reorienting." (*Id.*) During this time, Mr. Pankey caused a number of "Code Green" events to occur—*i.e.*, he tried to leave the facility despite the staff determining he required inpatient services. (*Id.* ¶ 29.)

On November 22, 2014, after becoming increasingly unstable and agitated, stating to staff members that he was "God" and "God does not have to take meds," he pushed past a staff member near a safety exit door and absconded from the Hospital. (*Id.* ¶¶ 34-35.) The Hospital issued a Code Green and staff members tried to locate Mr. Pankey, but could not. (*Id.* ¶ 36.)

Plaintiff alleges the Hospital was negligent in allowing Mr. Pankey to leave the facility, for not properly restraining him, for failing to have adequate security measures in place to prevent him from leaving, for failing to supervise him, and for failing to properly medicate him. (*Id.* ¶ 159.)

### b. After the Escape

After Mr. Pankey escaped, a psychiatrist employed at the Hospital issued an order pursuant to § 9.55 of the New York State Mental Hygiene Law requiring Mr. Pankey be apprehended by law enforcement authorities. (*Id.* ¶ 38.)[3] Hospital staff called various police agencies within the County of Dutchess, including the City of Poughkeepsie police and the Town of Poughkeepsie police. (*Id.* ¶¶ 39-40, 54, 57.) Plaintiff alleges the Hospital was negligent,

---

[3] The order is referenced throughout Plaintiff's complaint, and the City has provided a copy as part of its motion to dismiss. (*See* Decl. Thomas F. Kelly III in Supp. City Mot. ("Kelly Decl."), Ex. F (Mental Hygiene order issued the evening of Nov. 22, 2014), ECF No. 90.) The Court takes judicial notice of the text of the order.

however, because it failed to send copies of the Mental Hygiene order to all local law enforcement agencies. (*Id.* ¶ 159.)

When the Defendant Town police received the call from the Hospital, they informed the staff member that he should contact the City police because Mr. Pankey's home address was within the City's jurisdiction. (*Id.* ¶¶ 40-41, 55.) The Town is alleged to have made no efforts to apprehend Mr. Pankey. (*Id.* ¶ 46.) The Hospital also contacted the Defendant City Officers, who were familiar with Mr. Pankey and knew of his psychiatric problems, and informed them that he needed to be apprehended pursuant to a Mental Hygiene order issued that day. (*Id.* ¶¶ 56-57.) The Hospital explained that he was a "threat to his [own] safety" and "to the safety and well-being of others[.]" (*Id.* ¶ 57.) Nevertheless, the City Officers made no efforts to apprehend Mr. Pankey, to return him to the Hospital, or to contact Mrs. Case. (*Id.* ¶ 58.)

### c. Apprehended by the City and Turned Over to the Town

On November 25, 2014, the City Officers apprehended Mr. Pankey (*id.* ¶ 59), but despite their knowledge of his psychiatric history and of the Mental Hygiene order, they did not attempt to enforce the order or to contact Mrs. Case (*id.* ¶¶ 60-61). Instead, the City advised the Town that Mr. Pankey had been apprehended and held for arraignment. (*Id.* ¶¶ 42, 59.) The City turned Mr. Pankey over to the Town because of an outstanding criminal warrant,[4] and allegedly made no efforts to inform the Town of the Mental Hygiene order. (*Id.* ¶¶ 43, 47, 62.) Plaintiff

---

[4] The warrant is referenced in Plaintiff's complaint (PAC ¶¶ 43, 48), and the Town has provided a copy as part of its motion to dismiss. (*See* Decl. Steven C. Stern in Supp. Town Mot. ("Stern Decl."), Ex. A (arrest warrant issued by Justice Paul O. Sullivan of the Town of Poughkeepsie Justice Court on November 19, 2014 for the crime of grand larceny), ECF No. 110.) The Court takes judicial notice of the text of the warrant, though, as with the text of the Mental Hygiene order (*see supra* note 3), it does not impact the viability of Plaintiff's claims. Additionally, the Court notes that the City Officers were alerted to Mr. Pankey's activities on November 25 when he asked a store owner for money and "grabbed a free cookie off of the counter" as he exited the store. (*See* Kelly Decl., Ex. E.)

alleges the Defendant City Officers were negligent or deliberately indifferent to Mr. Pankey's well-being as a result of these failings. (*Id.* ¶ 179.)

The Defendant Town similarly, despite its own independent knowledge, did not inform the City of the Mental Hygiene order that required Mr. Pankey be returned to the Hospital. (*Id.* ¶ 44.) Nor did the Town contact Mrs. Case. (*Id.* ¶ 46.) Plaintiff alleges these failings amounted to negligence on the part of the Town (*id.* ¶ 164) and that the Town Officers were either negligent or deliberately indifferent to Mr. Pankey's due process rights when they failed to return him to the Hospital (*id.* ¶¶ 169, 172-74).

### d. Arraigned by the Town and Turned Over to the County

The Defendant Town Officers brought Mr. Pankey to the Town Justice Court to be arraigned on the outstanding criminal warrant. (*Id.* ¶ 48.) During his arraignment and subsequent transfer to the Defendant County, the officers did not inform those involved that a Mental Hygiene order had been issued with regard to Mr. Pankey. (*Id.* ¶¶ 49-50, 63.) Plaintiff alleges the Town Officers were either negligent or deliberately indifferent to Mr. Pankey's due process rights when they failed to impart this material information to the court and the Sheriff. (*Id.* ¶¶ 170-74.)

### e. Detained by the Sheriff at the County Jail

At the time that Mr. Pankey was in the custody of the County, Defendant CMC was under contract with the Sheriff's department to provide medical and mental health services to all inmates held at the jail. (*Id.* ¶ 101.) Thus, once Mr. Pankey was in the Defendant Sheriff's custody, he was under the care of either the Sheriff's office or CMC.[5] Mr. Pankey had been in

---

[5] Therefore, the description of the subsequent events, while only referencing the Sheriff's office, also includes alternative pleading regarding CMC. (*See generally* ¶¶ 101-36.)

the custody of the County Sheriff before, and on at least three prior occasions the Sheriff had been made aware of Mr. Pankey's mental illness. (*Id.* ¶¶ 64-66.) But once he was taken into custody by the Sheriff and placed in the County Jail on this occasion, Deputy Sheriff Shane Roth—who was neither a psychiatrist nor a mental health professional—conducted a suicide prevention screening with Mr. Pankey. (*Id.* ¶¶ 63, 67-69, 103-104.) Deputy Roth noted Mr. Pankey was "bipolar" and "acting strange." (*Id.* ¶¶ 69, 105.) The Sheriff's office noted that he needed a psychiatric referral. (*Id.* ¶¶ 74, 109-10.)

The next day, November 26, 2014, members of the Sheriff's office noted his past psychiatric history included a bipolar disorder diagnosis and that he had been hospitalized for psychiatric disorders. (*Id.* ¶¶ 76, 77 (the office was aware he was a "known entity in the mental health system with a diagnosis of bipolar"), ¶ 78 (aware of his history of "psychiatric illness and substance use"); *see also id.* ¶¶ 112-13, 115 (same for CMC).) The Sheriff's office found Mr. Pankey to be exhibiting poor insight, judgment, and impulse control, and determined he had bipolar disorder as well as an anti-social personality disorder. (*Id.* ¶¶ 78, 81-82, 111, 114, 117-18.) Furthermore, during an interview with a member of the Sheriff's office, he stated that he had "escaped" from the Hospital. (*Id.* ¶¶ 79, 116.) At that time, the department recommended that Mr. Pankey be transferred to mental health housing and evaluated by a psychiatrist. (*Id.* ¶¶ 83-84, 119-20.) Unfortunately, neither of those things occurred. (*Id.* ¶¶ 85-87, 121-23.)

Instead, after completing their initial assessment and interview, members of the Sheriff's office escorted him back to his cell in the County jail. (*Id.* ¶¶ 88-89.) During his return to his cell, Mr. Pankey complained about being touched by a Deputy Sheriff and behaved aggressively. (*Id.* ¶ 91.) Once he was in his cell, lying face down on his bunk, his restraints were removed and a nurse was called to medically evaluate him. (*Id.* ¶¶ 92-93.) But, because Mr. Pankey stood up

during the evaluation, the nurse, Kimberly Stickle, was directed to leave and could not complete the examination.  (*Id.* ¶ 94.)  While in his cell and in the presence of members of the Sheriff's office, he stated that "he wanted to go home."  (*Id.* ¶ 90.)

After the members of the Sheriff's office and Nurse Stickle departed, Mr. Pankey was left alone and unattended in his cell, with access to materials with which he could harm himself.  (*Id.* ¶¶ 95, 97 (the precise materials are not described in the complaint).)  Mr. Pankey proceeded to commit suicide.  (*Id.* ¶¶ 100, 136.)

As a result, Plaintiff alleges the County Defendants and CMC either acted negligently or pursuant to a policy of deliberate indifference to Mr. Pankey's well-being and his Due Process rights by, *inter alia*, failing to implement sufficient procedural safeguards to protect inmates suffering from mental illness.  (*Id.* ¶¶ 184, 195, 204.)  Plaintiff further alleges the County Deputies were deliberately indifferent as evidenced by their failing to stand guard by his cell, failing to obtain his medication, and failing to remove dangerous items from his cell.  (*Id.* ¶ 199.)

## II.     Procedural History

Between October 20, 2015, and December 30, 2015, within 90 days of Mrs. Case being appointed as Administratrix of Mr. Pankey's estate (*id.* ¶ 138), Plaintiff served Notices of Claim upon the Defendant Sheriff (*id.* ¶ 137), the Defendant Hospital (*id.* ¶ 142), the Defendant City and its Police Department (*id.* ¶ 147), and upon the Defendant Town and its Police Department (*id.* ¶ 152).  On February 3, 2016, a Section 50-h hearing was held pursuant to New York State General Municipal Law, where the attendees included the majority of the Defendants in this action.  (*See id.* ¶ 140 (Sheriff), ¶ 145 (Hospital), ¶ 150 (City), ¶ 155 (Town).)  Plaintiff commenced this lawsuit on February 9, 2016.  (*See* Compl., ECF No. 1.)

Each set of Defendants has moved to dismiss the operative complaint pursuant to Rule 12(b)(6) or 12(c).  (*See* ECF Nos. 78 (Hospital), 88 (City), 97 (County), 109 (Town), & 114 (CMC).)[6]  Plaintiff has cross-moved to amend the complaint to focus her federal claims on the City Officers as opposed to the City of Poughkeepsie, though she seeks to continue her negligence claims against the City.  (*See* ECF No. 85 & No. 86, Ex. A (proposed Third Am. Compl.), No. 94 (letter clarifying withdrawal of claims), No. 49 at ¶¶ 56-64, 179-86 (currently operative complaint asserting claims against City).)

## LEGAL STANDARDS ON A MOTION TO DISMISS AND CROSS-MOTION TO AMEND THE PLEADINGS

Under Rule 12(b)(6) or 12(c) motions to dismiss, the inquiry is whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *accord Hayden v. Paterson*, 594 F.3d 150, 160 (2d Cir. 2010) (applying same standard to Rule 12(c) motions).  "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Id.* at 679.  To survive a motion to dismiss, a complaint must supply "factual allegations sufficient 'to raise a right to relief above the speculative level.'"  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d

---

[6] Briefing of all of the motions was complete as of January 25, 2017.  (*See* Hospital Mem. in Supp. Mot. ("Hosp. Mem."), ECF No. 80; Decl. William H. Bave, Jr. in Supp. Mot. ("Bave Decl."), ECF No. 79; Pl. Mem. in Opp'n Hosp. Mot. ("Pl. Opp'n Hosp."), ECF No. 83; Hosp. Mem. in Reply to Pl. Opp'n ("Hosp. Reply"), ECF No. 82; City Mem. in Supp. Mot. ("City Mem."), ECF No. 89; Kelly Decl., ECF No. 90; Pl. Mem. in Opp'n City Mot. ("Pl. Opp'n City"), ECF No. 84; City Mem. in Reply to Pl. Opp'n ("City Reply"), ECF No. 92; Town Mem. in Supp. Mot. ("Town Mem."), ECF No. 111; Stern Decl., ECF No. 110; Pl. Mem. in Opp'n Town Mot. ("Pl. Opp'n Town"), ECF No. 112; Town Mem. in Reply to Pl. Opp'n ("Town Reply"), ECF No. 113; County Mem. in Supp. Mot. ("County Mem."), ECF No. 99; Aff. David L. Posner, Esq. in Supp. County Mot. ("Posner Aff."), ECF No. 98; Pl. Mem. in Opp'n County Mot. ("Pl. Opp'n County"), ECF No. 102; County Mem. in Reply to Pl. Opp'n ("County Reply"), ECF No. 103; CMC Mem. in Supp. Mot. ("CMC Mem."), ECF No. 115; Decl. Ellen A. Fischer in Supp. CMC Mot. ("Fischer Decl."), ECF No. 116; Pl. Mem. in Opp'n CMC Mot. ("Pl. Opp'n CMC"), ECF No. 118; CMC Mem. in Reply to Pl. Opp'n ("CMC Reply"), ECF No. 119; Pl. Mem. in Supp. Mot. to Amend. ("Pl. Amend. Mem."), ECF No. 87; Decl. Robert N. Isseks in Supp. Mot. to Amend ("Isseks Decl."), ECF No. 86.)

87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). The Court must take all material

factual allegations as true and draw reasonable inferences in the non-moving party's favor, but

the Court is "'not bound to accept as true a legal conclusion couched as a factual allegation,'" or

to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of

action." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

Federal Rule of Civil Procedure 15 governs amendments to pleadings. After the first

permissive amendment, further amendments are conditioned on either "the opposing party's

written consent or the court's leave"—the latter of which should be "freely give[n] . . .when

justice so requires." Fed. R. Civ. P. 15(a)(2). Although the standard is lenient, "[r]easons for a

proper denial of leave to amend include undue delay, bad faith, futility of amendment, and

perhaps most important, the resulting prejudice to the opposing party." *State Teachers Ret. Bd.

v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981) (citing *Foman v. Davis*, 371 U.S. 178, 182

(1962) ("In the absence of any apparent or declared reason—such as undue delay, bad faith or

dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments

previously allowed, undue prejudice to the opposing party by virtue of . . . the amendment, [or]

futility of amendment—the leave sought should, as the rules require, be 'freely given.'")).

Federal Rule of Civil Procedure 21 provides that, "[o]n motion or on its own, the court

may at any time, on just terms, add or drop a party." Fed. R. Civ. P. 21. Federal Rule of Civil

Procedure 20(a)(2) permits the joinder of persons as defendants in an action if "(A) any right to

relief is asserted against them jointly, severally, or in the alternative with respect to or arising out

of the same transaction or occurrence or series of transactions or occurrences; and (B) any

question of law or fact common to all defendants will arise in the action." Fed. R. Civ. P.

20(a)(2). "According to the Supreme Court, 'joinder of claims, parties and remedies is strongly

encouraged,' and 'the impulse is toward the broadest possible scope of action consistent with fairness to the parties.'" *Ferrara v. Smithtown Trucking Co.*, 29 F. Supp. 3d 274, 279-80 (E.D.N.Y. 2014) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 724 (1966)). "Thus, '[l]ike Rule 15, the requirements of Rule 20(a) should be interpreted liberally in order to enable the court to promote judicial economy by permitting all reasonably related claims for relief by or against different parties to be tried in a single proceeding.'" *Id.* (quoting *Liegey v. Ellen Figg, Inc.*, No. 02 Civ. 1492 (JSM) (JCF), 2003 WL 21361724, at *3 (S.D.N.Y. June 11, 2003)).

If during the proceedings the Court enters a Rule 16 scheduling order that further restricts amendments, then "the lenient standard under Rule 15(a) . . . must be balanced against the [stricter] requirement under Rule 16(b)[.]" *Holmes v. Grubman*, 568 F.3d 329, 334-35 (2d Cir. 2009) (internal citations omitted). Rule 16(b)(4) provides that "[a] schedule may be modified only for good cause and with the judge's consent," where "'good cause' depends on the diligence of the moving party." Fed. R. Civ. P. 16(b)(4); *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000).

Irrespective of whether undue delay, prejudice, bad faith, or, if applicable, lack of good cause can be established, leave to amend may independently be denied "on grounds of futility if the proposed amendment fails to state a legally cognizable claim or fails to raise triable issues of fact." *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 726 (2d Cir. 2010) (quoting *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110-11 (2d Cir. 2001)); *accord Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *Foman*, 371 U.S. at 182. In other words, "[a]n amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6)," or if the proposed amendments would be insufficient to support Article III standing—a threshold inquiry for courts.

*Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002); *Treiber v. Aspen Dental Mgmt., Inc.*, 94 F. Supp. 3d 352, 367 (N.D.N.Y. 2015), *aff'd*, 635 F. App'x 1 (2d Cir. 2016) (summ. order); *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008), *aff'd*, 561 U.S. 247 (2010). Thus, a court should deny a motion to amend if it does not contain enough factual allegations, accepted as true, to state a claim for relief that is "plausible on its face" or to demonstrate standing to bring the claim. *Riverhead Park Corp. v. Cardinale*, 881 F. Supp. 2d 376, 379 (E.D.N.Y. 2012) (quoting *Twombly*, 550 U.S. at 570) (denying motion to add claims as futile); *Ashmore v. Prus*, 510 F. App'x 47, 49 (2d Cir. 2013) (summ. order) ("granting leave to amend would be futile as the barriers to relief for [the alleged] claims cannot be surmounted by reframing the complaint" where *inter alia* plaintiff lacked standing to seek injunctive relief).

The central inquiry for the Court when considering a motion to dismiss in tandem with a motion to amend is, therefore, whether the proposed amended complaint can survive the motion to dismiss. In determining whether a complaint states a plausible claim for relief, a district court must consider the context and "draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. It is important to note that "pleading is not an interactive game in which plaintiffs file a complaint, and then bat it back and forth with the Court over a rhetorical net until a viable complaint emerges." *In re Merrill Lynch Ltd. P'ships Litig*, 7 F. Supp. 2d 256, 276 (S.D.N.Y. 1997). The court's "duty to liberally construe a plaintiff's complaint [is not] the equivalent of a duty to re-write it." *Geldzahler v. New York Medical College*, 663 F. Supp. 2d 379, 387 (S.D.N.Y. 2009) (internal citations and quotation marks omitted). A claim is facially plausible when the factual content pleaded allows a court "to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## DISCUSSION

Plaintiff's proposed Third Amended Complaint alleges the Town Officers were negligent or deliberately indifferent to Mr. Pankey's Due Process rights (Count III) and the Town was thus also negligent (Count II), the City Officers were negligent or deliberately indifferent (Count IV) and the City was thus similarly negligent, the County and Sheriff Anderson were negligent or deliberately indifferent to Mr. Pankey's Due Process rights (Count V), the County Deputies were deliberately indifferent to Mr. Pankey's Due Process rights (Count VI), CMC was negligent or had a policy of deliberate indifference towards the Due Process rights of pre-trial detainees, such as Mr. Pankey (Count VII), and the Hospital was negligent (Count I). During the briefing of Defendants' motions to dismiss, and after proposing her latest complaint, Plaintiff has withdrawn all claims against Chief Ronald J. Knapp of the City Police Department (Pl. Opp'n City at 1) and Chief Spero of the Town Police Department (Pl. Opp'n Town at 1). Furthermore, Plaintiff has withdrawn her § 1983 claims against the City, the Town, and CMC. (*See* Pl. Opp'n City at 1; Pl. Opp'n Town at 1; Pl. Opp'n CMC at 1.) Plaintiff has indicated, however, that she wishes to continue her negligence claims against the City based on her allegations—made as part of the proposed amended complaint—against the City Officers. (*See supra* note 1.)

The Court will address the remaining claims alleged against the various sets of Defendants starting with the federal causes of action. If Plaintiff's federal claims are plausibly alleged, exercising supplemental jurisdiction over her state law claims as they relate to the Defendants will be appropriate at this juncture.[7]

---

[7] The Court's supplemental jurisdiction, 28 U.S.C. § 1367(a), is available for these common law claims. *See Kirschner v. Klemons*, 225 F.3d 227, 239 (2d Cir. 2000) ("pendent party jurisdiction [is] possible where the claim in question arises out of the same set of facts that give rise to an anchoring federal question claim against another party"); *see, e.g.*, *Jones v. Nickens*, 961 F. Supp. 2d 475, 495 (E.D.N.Y. 2013) (court exercised supplemental jurisdiction over negligence claims asserted against hospitals, despite dismissing § 1983 claims against those entities, where federal claims remained against county and claims derived from a common nucleus of fact).

## I.      Federal Claims (Section 1983)

The gravamen of Plaintiff's federal claims concerns the conditions of Mr. Pankey's confinement, or more specifically the law enforcement agencies' responses to his mental health needs, after he escaped from the Hospital and was later detained on the unrelated criminal warrant.  "A pretrial detainee's claims of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eight Amendment . . . because, pretrial detainees have not been convicted of a crime and thus may not be punished in any manner—neither cruelly and unusually nor otherwise." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (internal quotations, modifications, and citations omitted); *see also Bell v. Wolfish*, 441 U.S. 520, 579 (1979) (Stevens, J., dissenting) (pretrial detainees "are innocent[s] . . . who have been convicted of no crimes[;] [t]heir claim is not that they have been subjected to cruel and unusual punishment in violation of the Eighth Amendment, but that to subject them to any form of punishment at all is an unconstitutional deprivation of their liberty").  It thus logically follows that "[a] detainee's [Due Process] rights are '*at least* as great as the Eighth Amendment protections available to a convicted prisoner.'"  *Darnell*, 849 F.3d at 29 (quoting *City of Revere v. Massachusetts Gen. Hosp.*, 463 U.S. 239, 244 (1983)) (emphasis added).

The duty of a state actor to protect those in state custody from harm stems from the special relationship created between the State and such an individual once the State choses to exercise plenary control over a detainee or inmate.  "[I]t is the State's affirmative act of restraining [an] individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the 'deprivation of liberty' triggering the protections of the Due Process Clause[.]"  *DeShaney v. Winnebago Cty.*

*Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989). "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *Id.* at 199-200.

"For example, . . . '[neither] prisoners [nor detainees] may [] be deprived of their basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety—and they may not be exposed to conditions that pose an unreasonable risk of serious damage to [their] future health.'" *Darnell*, 849 F.3d at 30 (quoting *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012)); *see also Estelle v. Gamble*, 429 U.S. 97, 105 (1976) ("deliberate indifference to a prisoner's serious illness or injury" violates Constitutional guarantees); *Farmer v. Brennan*, 511 U.S. 825, 828 (1994) (same with regard to "'deliberate indifference' to a substantial risk of serious harm to an inmate"). Relevant here, "[c]ourts have repeatedly held that treatment of a psychiatric or psychological condition may present a serious medical need." *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000) (internal quotation marks and citation omitted); *see also Spavone v. New York State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Estelle*, 429 U.S. at 104, and citing *Langley v. Coughlin*, 888 F.2d 252, 254 (2d Cir. 1989)) (the "medical needs" of prisoners or detainees includes "needs for mental health care").

As such, "[w]hile in custody, a pretrial detainee has a Fourteenth Amendment substantive due process right to care and protection, including protection from suicide" resulting from a pre-existing mental health disorder. *Kelsey v. City of New York*, 306 F. App'x 700, 702 (2d Cir. 2009). "A pretrial detainee may establish a § 1983 claim for allegedly unconstitutional conditions of confinement"—such as the denial of mental health care—"by showing that the officers acted with deliberate indifference to the challenged conditions." *Id.* (citation omitted); *see also Hare v. City of Corinth, Miss.*, 74 F.3d 633, 648 (5th Cir. 1996) ("Most circuits have

endorsed a deliberate indifference inquiry as the measure of state officials' constitutional duty to safeguard the basic human needs of pretrial detainees, including protection from suicide.").

Determining whether the conditions challenged rise to a "conscious shocking" level, however, requires "an exact analysis of the circumstances" in deference to the consistently limited nature of substantive due process rights. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998) ("Deliberate indifference that shocks in one environment may not be so patently egregious in another"). As the Second Circuit has recently explained:

> This means that a pretrial detainee must satisfy two prongs to prove a claim, an "objective prong" showing that the challenged conditions were sufficiently serious to constitute objective deprivations of the right to due process, and a "subjective prong"— perhaps better classified as a "*mens rea* prong" or "mental element prong"—showing that the officer acted with at least deliberate indifference to the challenged conditions.

*Darnell*, 849 F.3d at 29. Plaintiff's allegations in this case are that the various law enforcement Defendants were deliberately indifferent to Mr. Pankey's mental health needs when they failed to enforce the Mental Hygiene order, failed to inform others of the issuance of the order, and failed to provide him treatment or medication for his mental illness.

### a. Seriousness of the Alleged Deprivation of Medical Care

"There is no 'static test' to determine whether a deprivation is sufficiently serious; instead, 'the conditions themselves must be evaluated in light of contemporary standards of decency.'" *Darnell*, 849 F.3d at 30 (quoting *Blissett v. Coughlin*, 66 F.3d 531, 537 (2d Cir. 1995) (citing *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981))). "This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner." *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006). "For example, if the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is

sufficiently serious." *Id.* Courts may also consider whether "a temporary delay or interruption in the provision of otherwise adequate medical treatment" constitutes deliberate indifference to a serious risk of harm. *Id.*

In cases of alleged delay, "the seriousness inquiry is 'narrower,' and focuses on the particular risk of harm that resulted from the delay or interruption in treatment rather than the severity of the [plaintiff's] underlying medical condition." *Hamm v. Hatcher*, No. 05 Civ. 503 (ER), 2013 WL 71770, at *8 (S.D.N.Y. Jan. 7, 2013) (quoting *Salahuddin*, 467 F.3d at 280 (quoting *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003))). A claim of an unconstitutional delay or interruption in treatment is only cognizable if it "reflects deliberate indifference to a serious risk of health or safety, to a life-threatening or fast-degenerating condition[,] or to some other condition of extreme pain that might be alleviated through reasonably prompt treatment." *Amaker v. Coombe*, No. 96 Civ. 1622 (JGK), 2002 WL 523388, at *8 (S.D.N.Y. Mar. 29, 2002). "[I]n most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm." *Smith*, 316 F.3d at 187-88.

Here, as discussed below with regard to whether the law enforcement agencies were indifferent to Mr. Pankey's needs, none of the agencies are alleged to have taken *any* actions[8] related to Mr. Pankey's mental health care aside from the Sheriff's diagnostic inquiries directed at determining if he was in fact a suicide risk. *Cf. Leandry v. Cty. of Los Angeles*, 352 F. App'x 214, 216 (9th Cir. 2009) (plaintiff with serious mental health needs "was seen repeatedly by jail medical staff, all of whom determined that his symptoms were inconsistent with bipolar

---

[8] This renders the question of whether the treatment provided was "inadequate," *Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006), inapplicable. *See cf. Pooler v. Nassau Univ. Med. Ctr.*, 848 F. Supp. 2d 332, 347 (E.D.N.Y. 2012) ("conclud[ing] that the 'reasonable care' component of the objective prong needs to be considered in each case, including cases involving suicidality").

disorder").  Therefore, the inquiry for the Court is whether Mr. Pankey was either suffering from a condition that was *per se* sufficiently serious such that the denial of treatment could have led to serious harm, or—if the officers' alleged decisions to disregard the Mental Hygiene order is construed as a decision to *delay* his treatment—was subject to "a life-threatening or fast-degenerating condition or to some other condition of extreme pain that might [have] be[en] alleviated through reasonably prompt treatment."  *See Salahuddin*, 467 F.3d at 280; *Amaker*, 2002 WL 523388, at *8; *see also Liscio v. Warren*, 901 F.2d 274, 277 (2d Cir. 1990) (considering the mistreatment of alcohol withdrawal, a "condition [that] was both life-threatening and fast-degenerating").

A detainee, or a prisoner, need not actually commit suicide to have been suffering from a serious medical condition.  *See Young v. Choinski*, 15 F. Supp. 3d 172, 184 (D. Conn. 2014) ("case law within this Circuit recognizes that 'depression combined with severe anxiety attacks *or* suicide attempts is a serious medical need'") (emphasis added); *Barnes v. Ross*, 926 F. Supp. 2d 499, 506 (W.D.N.Y. 2013) (propensity to harm oneself or attempt suicide viewed as "sufficiently serious"); *Hale v. Rao*, 768 F. Supp. 2d 367, 378 (N.D.N.Y. 2011) (inmate's mental illness coupled with verbalized suicidal desires sufficiently serious); *Allah v. Kemp*, No. 08 Civ. 1008 (NAM) (GHL), 2010 WL 1036802, at *6 n.9 (N.D.N.Y. Feb. 25, 2010) (failure to provide plaintiff with a mental health evaluation, notwithstanding his attempted suicide three days earlier, was enough to meet "sufficiently serious" standard); *Zimmerman v. Burge*, No. 06 Civ. 0176 (GLS) (GHL), 2009 WL 3111429, at *8 (N.D.N.Y. Sept. 24, 2009) (collecting cases from other circuits) (inmate, diagnosed with depression by prison officials, who harbored potentially suicidal thoughts "suffered from a sufficiently serious medical need"); *Sims v. Daley*, No. 95

Civ. 3239 (LAP), 1997 WL 33608, at *5 (S.D.N.Y. Jan. 29, 1997) ("hearing voices and experiencing suicidal thoughts" with a history of mental illness was a serious medical need).

Indeed, even serious mental disorders that do not exhibit suicidal ideations qualify as sufficiently serious. *See, e.g.*, *Harvey v. Sawyer*, No. 09 Civ. 0598 (FJS) (DRH), 2010 WL 3323665, at *7 (N.D.N.Y. July 22, 2010), *report and recommendation adopted*, 2010 WL 3323669 (N.D.N.Y. Aug. 20, 2010) (inmate "undoubtedly suffering from a serious medical need, whether from bipolar disorder or paranoid schizophrenia"); *Guarneri v. Hazzard*, No. 06 Civ. 0985 (NAM) (DRH), 2008 WL 552872, at *6 (N.D.N.Y. Feb. 27, 2008) (inmate suffering from PTSD, bipolar disorder, and depression sufficiently alleged "a serious medical need as a result of his mental illnesses"); *Leandry*, 352 F. App'x at 216 (inmate's mental health needs were serious whether he suffered from bipolar disorder or intermittent explosive disorder); *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1316 (10th Cir. 2002) (court assumed, after discussing the severe impact obsessive compulsive disorder (OCD) can have on an individual, that it "qualifies as 'sufficiently serious'"); *Page v. Norvell*, 186 F. Supp. 2d 1134, 1137 (D. Or. 2000) (court assumed medical need was sufficiently serious due to inmate's diagnosed bipolar disorder).

Nevertheless, "[i]t goes without saying that '[s]uicide is a serious harm,'" which may result from a mental disorder. *See Sanville v. McCaughtry*, 266 F.3d 724, 733-34 (7th Cir. 2001) (citation omitted); *Silvera v. Conn. Dept. of Corr.*, 726 F. Supp. 2d 183, 191-92 (D. Conn. 2010) (plaintiff who suffered from severe mental health issues, was an acute suicide risk, and ultimately committed suicide due to acts and omissions of prison medical staff, was found to have demonstrated a sufficiently serious medical need); *Guglielmoni v. Alexander*, 583 F. Supp. 821, 826 (D. Conn. 1984) (court concluded that "[t]reatment of mental disorders of mentally disturbed inmates [was] a 'serious medical need' under *Estelle*" in case where inmate repeatedly

tried and eventually succeeded in committing suicide).  Therefore, no matter whether the denial

of treatment alleged here constitutes "a failure to provide *any* treatment" or "a temporary delay"

in the provision of what would otherwise have been adequate treatment, the specific risk of self-

harm to which Mr. Pankey was subject as a result of his bipolar disorder demonstrates the

seriousness of his medical condition.

"In this case, not only was there a risk of serious harm but that harm actually

materialized—[Mr. Pankey] committed suicide.  It would be difficult to think of a more serious

deprivation than to be deprived of life[.]"  *Sanville*, 266 F.3d at 733-34 (thus inmate clearly

"demonstrated a serious medical need"); *cf. Moots v. Lombardi*, 453 F.3d 1020, 1023 (8th Cir.

2006) (inmate failed to allege suffering harm as a result of temporary delay in treatment for his

bipolar disorder when he was transferred to solitary confinement).  As the preceding examples

demonstrate, the fact that the symptoms he exhibited while in the custody of the various law

enforcement agencies may have fallen short of announcing his suicidal intentions does not

reduce the seriousness of Mr. Pankey's medical needs.  His alleged condition was not only *per se*

serious, it was life-threatening, as confirmed by the hospital's decision to issue the Mental

Hygiene order in the first place.  *See* N.Y. Mental Hyg. Law § 9.55 (McKinney) (empowering a

qualified psychiatrist to issue such an order upon a determination that the individual in question

"appears to have a mental illness for which immediate observation, care and treatment in a

hospital is appropriate and which *is likely to result in serious harm to himself* or herself or

others") (emphasis added); *Project Release v. Prevost*, 722 F.2d 960, 966 (2d Cir. 1983) ("for a

person to be admitted as an emergency involuntary patient under section 9.39, he must have 'a

mental illness . . . which is likely to result in serious harm to himself or others'").

Therefore, on the basis of the allegations in the complaint, Plaintiff has plausibly alleged that Mr. Pankey suffered from a serious medical condition that carried with it a serious risk of harm if it was left untreated—even for a short period of time.

**b. Officers' Alleged Level of Indifference to the Deprivations**

The degree of deliberate indifference required to state a claim for a serious deprivation of a detainee's due process rights is lower than that required when considering a deprivation involving a convicted prisoner. As this Circuit recently recognized, a pretrial detainee can show either that "the defendant-official acted intentionally to impose the alleged condition, or recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the [] detainee even though the defendant-official knew, *or should have known*, that the condition posed an excessive risk to health or safety." *Darnell*, 849 F.3d at 35 (emphasis added); *see also Salahuddin*, 467 F.3d at 280 (quoting *Farmer*, 511 U.S. at 847) ("failing 'to take reasonable measures' in response to a medical condition can lead to liability"). Thus, "a pretrial detainee can prevail by providing *only* objective evidence" of irrational or excessive governmental action. *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473-74 (2015) (involving detainee's claims of excessive force) (emphasis added).[9] In short, the *mens rea* prong can be satisfied objectively rather than subjectively,[10] though there is still a floor: "any § 1983 claim for a violation of due

---

[9] This recent shift away from the Supreme Court's heightened awareness requirement, which originated in the prisoner and Eighth Amendment context, as detailed in *Farmer v. Brennan*, 511 U.S. 825 (1994), is in recognition of the distinctions drawn between prisoner's claims of cruel and unusual punishment as compared to Fourteenth Amendment claims asserted against those charged with caring for pretrial detainees. *See Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) ("conclud[ing] that the Supreme Court's decision in *Kingsley* [*v. Hendrickson*, 135 S. Ct. 2466 (2015),] altered the standard for deliberate indifference claims under the Due Process Clause"); *compare Kingsley*, 135 S. Ct. at 2473-74 ("a pretrial detainee can prevail by providing only objective evidence" of irrational or excessive governmental action), *with Farmer*, 511 U.S. at 838 ("an official's failure to alleviate a significant risk that he should have perceived *but did not*, while no cause for commendation, cannot under our cases be condemned as [an unconstitutional] infliction of punishment").

[10] Despite the importance of this issue to the pending motions to dismiss, none of the parties briefed this development. Nevertheless, because Plaintiff generally alleges awareness on the part of the officers, the parties' failure to do so did not greatly impact the analysis of the issues contained herein.

process requires proof of a *mens rea* greater than mere negligence." *Darnell*, 849 F.3d at 35-36 ("A detainee must prove that an official acted intentionally or recklessly").

To avoid liability, each state entity seeks to pass the blame—and the Hospital argues it had nothing to do with the lapses that led to Mr. Pankey's eventual suicide. (*See, e.g.*, City Mem. at 8-9 ("while the City's transfer of [Mr. Pankey] to the custody [of] the Town [] was one link in a chain of events that ended in [his] demise, its actions cannot be said to be a proximate cause of his death"); Town Mem. at 1 ("[t]he Town Defendants only transported Pankey to court on a lawful arrest warrant. . . . [and] [t]he litany of alleged failures by the County defendants and their medical services provider to address Pankey's mental health issues severed the chain of causation as to the Town Defendants"); Hosp. Mem. at 7 ("[t]he arrest of decedent and subsequent remand to jail were not situations which were the 'normal or foreseeable consequence of the situation created' by the Hospital's alleged [acts]").) The Sheriff's office argues that because it attempted to screen Mr. Pankey for mental illnesses and had no actual knowledge of his suicidal condition, it did all that it had to do to protect him. (*See* County Reply at 4 ("[t]he screening about which plaintiff complains did not itself harm Mr. Pankey").)

But Plaintiff has alleged that the officers involved at each juncture had *some* level of awareness of Mr. Pankey's mental illness. (*See* PAC ¶¶ 53, 56-57 (City); *id.* ¶¶ 40-41, 55 (Town); *id.* ¶¶ 64-66, 76-78 (County).) Thus, to provide no treatment would be to ignore a serious medical need, and to delay treatment would be to run the very risk of self-harm that reasonably prompt treatment was designed to avoid.

### i. City & Town Officers

Plaintiff alleges that the City "John Doe" Officers accompanied Mr. Pankey to the hospital when he was first admitted, received a call from the hospital when he escaped, were

informed of the Mental Hygiene order issued because Mr. Pankey was a threat to his own safety, and chose to ignore the order and, instead, turn him over to the Town on the basis of an outstanding criminal warrant (issued the day before he was admitted to the Hospital). (PAC ¶¶ 53, 56-57, 59.) Similarly, Plaintiff alleges the Town "John Doe" Officers received a call from the hospital when Mr. Pankey escaped, were informed of the Mental Hygiene order, and chose to ignore the order and, instead, take Mr. Pankey to the Town Court to be arraigned on the outstanding criminal warrant. (*Id.* ¶¶ 40-41, 44, 55.) Just as the City Officers allegedly failed to impart any pertinent information to the Town Officers (*id.* ¶¶ 43, 47, 62), the Town Officers allegedly failed to impart any of the relevant information to either the Town Court or the Sheriff's office (*id.* ¶¶ 49-50, 63).

The complete inaction on the part of the City and Town Officers with regard to Mr. Pankey's mental condition, of which the officers were either aware or should have been aware, rises above the level of negligence. Taking as true Plaintiff's allegations that the City Officers and the Town Officers were aware of the issuance of the Mental Hygiene order and failed to impart any of this information—or to act on the order—their inaction constitutes a failure to alleviate a significant risk of harm. *See Thomas v. Ashcroft*, 470 F.3d 491, 497 (2d Cir. 2006) (allegations sufficiently demonstrated deliberate indifference where "complaint allege[d] that the prison officials were on notice of [detainee's] medical needs and were aware of the improper administration of his medications, yet failed to address the situation"); *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1025 n.1 (3d Cir. 1991) ("Custodians have been found to 'know' of a particular vulnerability to suicide when they have had actual knowledge of an obviously serious suicide threat, a history of suicide attempts, *or a psychiatric diagnosis identifying suicidal propensities*.") (emphasis added).

Even if the officers ignored the order because of a belief that the criminal warrant trumped the need to return Mr. Pankey to the hospital (*see* City Mem. at 6 & Town Mem. at 7-8),[11] their failure to alert the next set of authorities that he had been deemed a risk to himself demonstrates an indifference to Mr. Pankey's mental health needs that rises at least to the level of recklessness. *See, e.g.*, *Soriano v. Cty. of Riverside*, No. 16 Civ. 0155 (BRO) (SPX), 2016 WL 6694491, at *1, 6 (C.D. Cal. Sept. 8, 2016) (plaintiffs sufficiently alleged deliberate indifference to detainee's medical health needs where officers, who were "allegedly aware of [his] prior mental health issues," decided to arrest him rather than place him in an "involuntary psychiatric hold"); *cf. Conn v. City of Reno*, 572 F.3d 1047, 1062 (9th Cir. 2009), *as reinstated by* 658 F.3d 897 (9th Cir. 2011) ("When a detainee attempts or threatens suicide en route to jail, it is obvious that the transporting officers must report the incident to those who will next be responsible for her custody and safety.").

Therefore, Plaintiff has plausibly alleged at this stage that the City and Town Officers were deliberately indifferent to Mr. Pankey's plight.[12]

---

[11] Contrary to the Town's contention that "the decision to bring Pankey to the Justice Court pursuant to the arrest warrant did not amount to 'unnecessary and wanton infliction of pain, or other conduct that shocks'" (Town Mem. at 7), the deliberate indifference inferred is that of the Town failing to address Mr. Pankey's medical health needs in any fashion during that process.

Moreover, neither the City nor the Town present any authority for the proposition that enforcing a criminal warrant should supersede a Mental Hygiene order (and arguably even pressing this contention demonstrates an ongoing lack of appreciation for the acute danger that an individual subject to such an order is facing at that moment in time). *See also cf. Rivera v. Russi*, 243 A.D.2d 161, 166 (2d Dep't 1998) ("police have not only the authority, but the obligation, to enforce an order of the court to produce [], and remove to a proper facility, a mentally ill person").

[12] Contrary to the City's position, Plaintiff has plausibly alleged that harm—a delay in treatment—was inflicted upon Mr. Pankey while he was in the City's custody. (*See* City Mem. at 4 ("no harm was inflicted upon [Mr. Pankey] from the time that the City of Poughkeepsie Police took [him] into custody . . . until he was transferred to the custody of the Town of Poughkeepsie").)

### ii. County Sheriff and Deputies

Plaintiff alleges, contrary to the County's assertions (*see* County Reply at 2), that the Sheriff was personally involved in Mr. Pankey's arraignment (PAC ¶ 63)[13] and that the Sheriff was aware—due to Mr. Pankey's multiple incarcerations at the County jail—of his mental health issues (*id.* ¶¶ 64-66). *See also Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each []official defendant, through the official's own individual actions, has violated the Constitution."). Furthermore, once he was booked, a member of the Sheriff's office noted Mr. Pankey was "bipolar," "acting strange," and needed a psychiatric referral. (PAC ¶¶ 69, 74, 105, 109-10.) The next day, the office allegedly became aware of his history of psychiatric illness, that he had "escaped" from a hospital, and determined he was exhibiting poor insight, judgment, and impulse control. (*Id.* ¶¶ 76-79, 111-18.) Yet, the only action the jail took was to mark Mr. Pankey for a transfer to mental health housing and a psychiatric evaluation. In the end, Mr. Pankey, who suffered from a serious mental health disorder, was left completely unguarded, unwatched, and unsafe (from himself) in a standard county jail cell. The result is hardly unforeseeable.

Plaintiff also alleges that the employees of the Sheriff's office (and CMC) "were aware" or "should have been aware" that a Mental Hygiene order has been issued, that Mr. Pankey was a

---

[13] The County claims that Plaintiff does not allege any personal involvement on the part of the Sheriff, requiring the claims against him be dismissed. (*See* County Mem. at 3); *see Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (claims properly dismissed where "no [direct or] indirect allegations [were present] sufficient to permit an inference the [defendant] Warden had acted or failed to act in any of the ways that would subject him to personal liability for the deprivations alleged by [detainee]"). Plaintiff's opposition to the County's motion to dismiss argues the County is "interpreting the [complaint's] allegations incorrectly." (Pl. Opp'n County at 6-7, 8 ("Plaintiff submits that these specific factual allegations sufficiently support the [complaint's] more conclusory allegations and therefore state a claim against [Sheriff] Anderson based upon his personal involvement in the deprivations").) Whatever their contentions about the plain meaning of the allegations in the complaint, the Court has an obligation to take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor. The proposed amended complaint (and the operative complaint) allege that "following the arraignment in the Town of Poughkeepsie Justice Court, Kaseem J. Pankey was taken into custody *by the Dutchess County Sheriff* and placed in the Dutchess County Jail." (*See* PAC ¶ 63.) The Court must accept this fact as true.

danger to himself and others, and that he needed medication to control his bipolar disorder. (¶¶ 70-72, 106-108.)  Neither the operative complaint nor the proposed amended complaint, however, gives any indication as to how the County, including the Sheriff and the Deputies, would have been aware of the order or related information, and in fact allege, as explained above, that neither the City nor the Town informed them of the issuance of the order.  On the basis of Plaintiff's allegations, the Court cannot infer that the County employees were aware—or should have been aware—of the issuance of the Mental Hygiene order.  But the Court can infer the Sheriff's office and its employees were aware of Mr. Pankey's need for mental health care.

"[O]ther Circuits [and this Circuit] have, in general, found deliberate indifference lacking where officers take affirmative and reasonable steps to protect detainees from suicide[.]"  *Kelsey v. City of New York*, 306 F. App'x 700, 703 (2d Cir. 2009); *see, e.g.*, *Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2001) (no deliberate indifference where officer "responded reasonably" to suicide risk by placing detainee under "medical watch," which involved constant video surveillance); *Rhyne v. Henderson County*, 973 F.2d 386, 393-94 (5th Cir. 1992) (no deliberate indifference where officers checked suicidal inmates only every ten minutes); *Rellergert v. Cape Girardeau Cty., Mo.*, 924 F.2d 794, 797-98 (8th Cir. 1991) (no deliberate indifference where officer attending to conflicting responsibilities let inmate out of his sight with a bed sheet, although inmate was on suicide watch).

In contrast to such reasonable protective steps, Plaintiff has alleged that the Sheriff and his Deputies became aware of Mr. Pankey's serious mental health needs and chose to largely do nothing.  Their alleged failure to act plausibly constitutes deliberate indifference to a serious risk of harm, which in this case materialized.  *Compare Kelsey*, 306 F. App'x at 703 ("In light of [the] [d]efendants' substantial efforts to secure [the detainee]," which included "seizing

dangerous items he possessed" and "handcuffing him behind his back," summary judgment in their favor was appropriate since "no reasonable fact finder could find that [they] were deliberately indifferent to the risk of [his] suicide"), *with Thomas*, 470 F.3d at 497 (allegations sufficiently demonstrated deliberate indifference where "complaint allege[d] that the prison officials were on notice of [detainee's] medical needs and were aware of the improper administration of his medications, yet failed to address the situation").

The Court recognizes that the County employees tasked with Mr. Pankey's care may have been unaware of the Mental Hygiene order, and they therefore may not have been specifically aware of his acute risk of self-harm, in contrast to the City and Town Officers. *See, e.g.*, *Madden v. City of Meriden*, 602 F. Supp. 1160, 1168 (D. Conn. 1985) (officers exhibited "deliberate indifference to [detainee's] medical needs" when he "was placed alone in a jail cell" and "allowed to hang himself" despite officers' "actual knowledge of his psychological problems and previous attempts at self-injury"). Nevertheless, on the basis of Plaintiff's allegations, Mr. Pankey's behavior combined with the information the Sheriff's office did possess—his prior mental health issues, his bipolar disorder, his strange behavior, and his statement that he had "escaped" from a hospital—should have made them aware that he needed *some* form of immediate mental health treatment including heightened monitoring or safety precautions.

Therefore, Plaintiff has plausibly alleged that the Sheriff[14] and the Deputies were deliberately indifferent to Mr. Pankey's serious medical needs.

---

[14] Because the Court construes the allegations in Plaintiff's complaint to allege personal involvement on behalf of the Sheriff, there is no cause to consider other grounds for supervisory liability under § 1983. *See Raspardo v. Carlone*, 770 F.3d 97, 117 (2d Cir. 2014) (noting that the Second Circuit has "not yet determined the contours of the supervisory liability test" post-*Iqbal*); *see also Starr v. Baca*, 652 F. 3d 1202, 1207 (9th Cir. 2011) ("We see nothing in *Iqbal* indicating that the Supreme Court intended to overturn longstanding case law on deliberate indifference claims against supervisors in conditions of confinement cases.").

### c. Allegations of Due Process Deprivations Relating Specifically to the Enforcement of the Mental Hygiene Order

Plaintiff also asserts that the failure to enforce the Mental Hygiene order was, standing alone, a violation of Mr. Pankey's due process rights.  (*See, e.g.*, PAC ¶ 173 (alleged against Town Officers).)  Such a claim can theoretically implicate a detainee's rights to procedural due process, substantive due process, or both.

### i. Procedural Due Process

"The procedural component of the Due Process Clause 'provides that certain substantive rights—life, liberty, and property—cannot be deprived *except* pursuant to constitutionally adequate procedures.'"  *Nnebe v. Daus*, 184 F. Supp. 3d 54, 62 (S.D.N.Y. 2016) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985)) (emphasis added).  Plaintiff, in one paragraph of her complaint, asserts that the failure to enforce the Mental Hygiene order also implicates Mr. Pankey's *procedural* due process rights.  (PAC ¶ 173.)  Such a claim would hinge, therefore, on Plaintiff having a protected interest in the order, which he was subsequently deprived of without proper process.  Yet Plaintiff appears primarily concerned with the immediate ramifications of depriving Mr. Pankey of his interest in the order, which is still in essence a *substantive* due process claim: "[u]nlike procedural due process, which permits a state to deprive a person of life, liberty or property when it provides a procedural remedy, substantive due process imposes limits on what a state may do regardless of what process is provided." *Madden*, 602 F. Supp. at 1166.

None of Plaintiff's allegations focus on the inadequacy of the procedures used to arraign Mr. Pankey on the outstanding warrant despite the issuance of the Mental Hygiene order.  *See Nnebe*, 184 F. Supp. 3d at 62 (quoting *Green v. Bauvi*, 46 F.3d 189, 194 (2d Cir. 1995)) ("in evaluating a claim for a denial of *procedural* due process, a court must consider two questions:

(1) 'whether the plaintiff possessed a liberty or property interest protected by the United States Constitution or . . . [by] statute[]"; and if so, (2) '*what process was due* before the plaintiff could be deprived of that interest'") (emphasis added).  Rather, the allegations point to failings on the part of the officers to address Mr. Pankey's mental health issues by, *inter alia*, ignoring the order altogether.  Since Plaintiff has not alleged procedural deficiencies in the process used to deprive Mr. Pankey of his interest, if any, in the enforcement of the Mental Hygiene order, this claim is best considered irrespective of process—as a deprivation of a substantive due process right.

### ii. Substantive Due Process: Liberty or Property Interest

Substantive due process, in contrast, protects individuals from proscribed deprivations of life, liberty, and property no matter the process employed by the State.  *See Madden*, 602 F. Supp. at 1166 ("substantive due process . . . is a source of rights which may not be taken away under any circumstances").  In this case, the failure to enforce the Mental Hygiene order coincided with the City and Town Officers' failure to provide any form of mental health care for Mr. Pankey while he was in their respective custody or to document his condition with the other agencies involved.  As discussed above, conditions of confinement are quintessential questions of an individual's substantive due process protected liberty interests.  But if Plaintiff is also seeking to assert an independent claim for denial of substantive due process rights with regard to an interest in the order itself—claiming that Mr. Pankey had a right to have the order enforced and was deprived of his interest in that enforcement—then the right sought to be protected would be a *property* interest in the order, *see Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 766 (2005) (considering whether "an individual entitlement to enforcement of a restraining order could constitute a 'property' interest for purposes of the Due Process Clause"), as opposed to his protected *liberty* interests—*i.e.*, to be safeguarded while in state custody.

To assert such a substantive due process claim with regard to enforcement of the order, meaning "for deprivation of property without due process of law, a plaintiff must identify a property interest protected by the Due Process Clause." *Harrington v. Cty. of Suffolk*, 607 F.3d 31, 34 (2d Cir. 2010). But to qualify as a protected property interest, such an interest must mandatorily arise out of "an independent source such as state law" and be sufficiently individual in its nature. *Id.* Moreover, the plausible allegations here, including the alleged decision to ignore the order, evince deliberate indifference to Mr. Pankey's medical needs rather than a separate substantive due process violation designed to deprive him of the benefit of the order. This is not a case where the alleged violation is simply that a Mental Hygiene order was issued and the officers ignored calls to enforce the order up to the point where Mr. Pankey took his own life. Rather, the officers did act—arresting Mr. Pankey on a separate outstanding warrant—and simultaneously chose not to act regarding the order.

In these circumstances, the officers' alleged inaction with regard to the order more squarely implicates Mr. Pankey's protected liberty interests rather than constituting an independent deprivation of a protected property interest. The Court can easily infer from the facts alleged that the City and Town Officers were aware that Mr. Pankey posed a significant risk of harm to himself and others vis-à-vis their knowledge of the order yet acted indifferently to that risk when they opted not to return him to a hospital for mental health treatment and, moreover, not to impart that information to the next jurisdiction asserting custody over Mr. Pankey as he was passed down the line. *See, e.g.*, *Whitley v. Hanna*, 726 F.3d 631, 651-52 (5th Cir. 2013) (Elrod, J., concurring) (quoting *DeShaney*, 489 U.S. at 195, and *Doe v. Taylor Indep. Sch. Dist.*, 15 F.3d 443, 450-51 (5th Cir. 1994)) ("although the substantive component of the Due Process Clause does not 'requir[e] the State to protect the life, liberty, and property of its citizens

against invasion by private actors,' it does protect against 'state-occasioned damage to a person's bodily integrity'").

Because the Court has already determined that ignoring the order as alleged would violate Mr. Pankey's protected liberty interests, it declines to decide whether Mr. Pankey had a separate protected property interest in the enforcement of the order such that failure to enforce the order was, on its own, a violation of his substantive due process rights. *See Gonzales*, 545 U.S. at 768 ("[estranged wife] did not, for purposes of the Due Process Clause, have a property interest in police enforcement of the restraining order against her [estranged] husband"). "[T]he existence of an underlying constitutional violation differentiates [such a] case from *Gonzales* and *DeShaney*, which examined the scope of a state official's duty to interfere with private violence," requiring an inquiry into other forms of protected interests pursuant to substantive due process. *Whitley*, 726 F.3d at 651-52 (Elrod, J., concurring). Plaintiff has already identified actionable substantive due process violations; thus, there is no need to decide whether a subset of the officers' actions would have independently violated his substantive due process rights, particularly where Plaintiff has done little to allege a protected property interest stemming from state law and individualized to Mr. Pankey.

### d. Qualified Immunity

Having determined that Plaintiff has plausibly alleged deliberate indifference to Mr. Pankey's constitutionally protected rights on the part of the City and Town Officers, the County Deputies, and the County Sheriff, the Court must consider whether these Defendants are nonetheless immune from liability. "The doctrine of qualified immunity gives officials 'breathing room to make reasonable but mistaken judgments about open legal questions.'" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 743

(2011)).  Thus, "qualified immunity shields . . . officials from suit 'unless [1] the official violated a statutory or constitutional right that [2] was clearly established at the time of the challenged conduct.'"  *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (quoting *Reichle v. Howards*, 566 U.S. 658, 132 S. Ct. 2088, 2093 (2012)).

Defendants invoke the doctrine (*see, e.g.*, Town Mem. at 11-12 & County Mem. at 6-7) hoping to cast the question of Mr. Pankey's care—or lack thereof—into a constitutional grey zone, immunizing the individuals involved from liability for the acts or omissions alleged.  To do so, Defendants' rely on *Taylor v. Barkes*, 135 S. Ct. 2042, 2044-45 (2015), where the Supreme Court recently explained that none of its prior decisions clearly "establishe[d] a right to the proper implementation of adequate suicide prevention protocols."  In surveying the relevant precedent from the circuit courts, and specifically leaving open the question of whether "a right can be 'clearly established' by circuit precedent despite disagreement in the courts of appeals," *Barkes*, 135 S. Ct. at 2044-45, the Court determined that as of November 2004 such a right was not clearly established.  *See Cox v. Glanz*, 800 F.3d 1231, 1250 (10th Cir. 2015) ("Consequently, in November 2004, a jail's nonexistent or deficient suicide-screening measures would not have *necessarily* indicated that an individual prisoner's suicide was the product of deliberate indifference in violation of the Eighth Amendment.") (emphasis added).

But this case is about more than the County's allegedly inferior mental health screening process or the lack of screening conducted by the City and Town.  As Plaintiff aptly states with regard to Defendant Sheriff Anderson:

> Once a jail has actual or constructive notice that an inmate is in danger of committing suicide due process requires the jail to take reasonable measures to abate that danger. This is not a new due process requirement; it was clearly established long before [Sheriff] Anderson's subordinates left [Mr.] Pankey alone and unmonitored in the cell where he killed himself.

(Pl. Opp'n County at 13); *Bays v. Cty. of Montmorency*, No. 15-10534 (RHC), 2016 WL 1728569, at *3 n.1 (E.D. Mich. May 2, 2016) (quoting *Barkes*, 135 S. Ct. at 2043) ("*Barkes* is distinguishable from the case at hand because, unlike here, it was 'undisputed that neither petitioner had personally interacted with [the decedent] or knew of his condition before his death.'"); *see also Weishaar v. Cty. of Napa*, No. 14 Civ. 1352 (LB), 2016 WL 7242122, at *11 (N.D. Cal. Dec. 15, 2016) (when considering the issue of qualified immunity in this context, "the pivotal question . . . might be phrased thus: On the 'particular facts' of this case, in this 'specific context,' did [the detainee] pose a 'serious risk of suicide' so that any 'reasonable,' 'competent' officer would have known that they could not be 'deliberately indifferent' to his plight, and that by failing to do more than they did to protect him from suicide . . . they were clearly violating his constitutional rights?").[15]

Plaintiff alleges more than a simple failure to implement proper suicide screening procedures: she alleges Mr. Pankey had interactions with officers in three jurisdictions, each of which were aware of his history of mental illness, of the Mental Hygiene order, or both, where the officers proceeded to process Mr. Pankey in the normal course despite this information. Perhaps if he was an entirely unknown detainee with no known history of incarceration or mental health issues then the law enforcement agencies' failures to adequately screen him for suicide

---

[15] The Town Defendants have incorrectly framed issue solely around "their decision to transport Pankey to the Justice Court, pursuant to a lawful arrest warrant, despite knowledge of the Mental Hygiene order." (*See* Town Mem. at 11-12.) This formulation wholly ignores the Town's alleged omissions regarding Mr. Pankey's mental health needs, including the alleged failure to pass the information on to the Justice Court and the Sheriff. The City similarly attempts to narrow the question to *only* the enforcement of the order. (*See* City Mem. at 6-8.)

On reply, the Town refines its argument, asserting: "No clearly established law either required the police to prefer the alleged notification about a Mental Hygiene order over a written court-issued arrest warrant, and no clearly established law renders unconstitutional the failure to tell the court or Sheriff about such notification." (*See* Town Reply at 3.) But, as discussed *infra*, the latter contention is false: it is clearly established that custodians need to provide for the mental health needs of pretrial detainees—and in this case, that might have been as simple as informing the next jurisdiction of either Mr. Pankey's risk of self-harm or the existence of the order. Failing to do either, however, constitutes deliberate indifference to clearly established law.

risks *alone* would not violate clearly established rights based on this Circuit's precedent.[16]

Given the facts alleged here, however, Defendants' qualified immunity arguments ignore that the right of those in state custody "to be free from deliberate indifference to [their] serious medical needs has been clearly established for decades." *Cf. Randle v. Alexander*, 170 F. Supp. 3d 580, 596 (S.D.N.Y. 2016) (considering and rejecting qualified immunity in the Eighth Amendment context where officials ignored a prisoner's history of suicidal tendencies); *see Sinkov v. Americor, Inc.*, 419 F. App'x 86, 89 (2d Cir. 2011) (affirming jury verdict where "evidence was sufficient 'to support a conclusion by a reasonable juror'" that company which had contracted with a county "to provide medical care to detainees" was "'actually aware' of [detainee's] risk of suicide and was deliberately indifferent to that risk"); *Kelsey v. City of New York*, No. 03 Civ. 5978 (JFB) (KAM), 2006 WL 3725543, at *9 (E.D.N.Y. Dec. 18, 2006), *aff'd*, 306 F. App'x 700

---

[16] This Court could, based on authority from this Circuit and others, consider whether the County's alleged failure to implement adequate suicide-screening protocols plausibly alleges deliberate indifference to the rights of pre-trial detainees in contravention of clearly established law. *See Dolan v. Connolly*, No. 13 Civ. 5726 (GBD) (GWG), 2017 WL 193286, at *8 (S.D.N.Y. Jan. 18, 2017) (rejecting the argument that *Barkes* foreclosed this avenue), *report and recommendation adopted*, 2017 WL 825311 (S.D.N.Y. Mar. 2, 2017) (quoting *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014)) ("a court may [] treat the law as clearly established if decisions from [the Second Circuit] or other circuits clearly foreshadow a particular ruling on the issue") (internal quotation omitted); *cf. United States v. Erie Cty., NY*, 724 F. Supp. 2d 357, 363 (W.D.N.Y. 2010) (Department of Justice alleged county was "deliberately indifferent to the health and safety" of pretrial detainees "in violation of the Eighth and Fourteenth Amendments" for, *inter alia*, "provid[ing] inadequate suicide prevention and mental health care"); *Langley v. Coughlin*, 715 F. Supp. 522, 540 (S.D.N.Y. 1989) ("[expert] affidavits [were] sufficient to create triable issues with respect to whether plaintiffs were injured by the deliberate indifference of state officials in the handling of medical care," including "alleged failure to provide minimally adequate screening and care for those placed on SHU"); *Conn v. City of Reno*, 572 F.3d 1047, 1063 (9th Cir. 2009) ("Had the[] [officers] been trained in suicide prevention, there is a reasonable probability that they would have responded differently and reported to the jail that [arrestee] was at risk of suicide, or taken her directly to the hospital."); *but see Belcher v. Oliver*, 898 F.2d 32, 34-35 (4th Cir. 1990) ("The general right of pretrial detainees to receive basic medical care does not place upon jail officials the responsibility to screen every detainee for suicidal tendencies."); *Burns v. City of Galveston*, 905 F.2d 100, 104 (5th Cir. 1990) ("Failure to train police officers in screening procedures geared toward detection of detainees with suicidal tendencies may rise to the level of a constitutional deprivation only if the right of detainees to adequate medical care includes an absolute right to psychological screening. We perceive no such right."); *Gray v. City of Detroit*, 399 F.3d 612, 616 (6th Cir. 2005) ("there is no general constitutional right of detainees to receive suicide screenings or to be placed in suicide safe facilities, unless the detainee has somehow demonstrated a strong likelihood of committing suicide"); *Cox v. Glanz*, 800 F.3d 1231, 1247 (10th Cir. 2015) ("an inmate's right to proper prison suicide screening procedures during booking [] was not clearly established in July 2009"). Such consideration, however, is unnecessary in this case.

(2d Cir. 2009) ("a pretrial detainee's right to be free from deliberate indifference by police officers to suicide, while in custody, is a clearly established right"); Kyla Magun, *A Changing Landscape for Pretrial Detainees? The Potential Impact of* <u>*Kingsley v. Hendrickson*</u> *on Jail-Suicide Litigation*, 116 Colum. L. Rev. 2059, 2068 (2016) ("The Supreme Court has never explicitly established that a prisoner has the right to be protected from suicide, and lower courts have found no duty to screen all detainees for 'suicidal tendencies.' However, *Farmer* and *Estelle* establish that there is a duty to protect prisoners from conditions leading to suicide when they amount to a "condition[] posing a substantial risk of harm" or when the officer failed to attend to a "serious medical need[].") (citations omitted).[17]

The Supreme Court's holding in *Barkes* is, thus, not in tension with a finding that a detainee has a clearly established right to protection from serious risks of harm, including suicide.[18] Furthermore, the defense of qualified immunity faces a "formidable hurdle" when asserted on a motion to dismiss, since Plaintiff "is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *McKenna v. Wright*, 386 F.3d 432, 434-36 (2d Cir. 2004). Plaintiff has made sufficient allegations of deliberate indifference to Mr. Pankey's serious medical needs, and,

---

[17] This is not circular reasoning, as asserted by the County. (*See* County Reply at 4 ("Under plaintiff's theory, the immunity afforded a Sheriff against a claim based upon an inadequate suicide prevention protocol has no meaning. If he/she can still be sued, for instance, for not having constant supervision, the need for which was not identified in the inadequate screening, immunity is functionally erased.").) The reason that qualified immunity does not apply based on the facts alleged is that Plaintiff has alleged an additional avenue by which the County could have deprived Mr. Pankey of his substantive due process rights—deliberate indifference to his serious medical needs. Whether or not the "inadequate screening" picked up his need for constant—or periodic—supervision, the County *should have known* that his mental health disorders carried a serious risk of harm requiring additional care.

[18] Indeed, courts considering this right post-*Barkes* continue to conclude the right is clearly established. *See Estate of Clark v. Walker*, No. 16-3560, 2017 WL 3165632, at *6 (7th Cir. July 26, 2017) (in the Seventh Circuit, the right to treatment of a serious medical need, including risk of suicide, is clearly established); *Campos v. Cty. of Kern*, No. 14 Civ. 1099 (DAD) (JLT), 2017 WL 915294, at *10 (E.D. Cal. Mar. 7, 2017) ("the law regarding the Fourteenth Amendment right to adequate medical care," including right "to be protected from the known risks of suicide in jail," was "clearly established" in the Ninth Circuit by "the time of decedent's suicide, August 2013").

based on those allegations, the Court will infer at this stage that the officers did not "make reasonable but mistaken judgments," *al–Kidd*, 563 U.S. at 743, but instead made reckless decisions in violation of the clearly established law in this Circuit. *See cf. Elliott v. Cheshire Cty.*, 940 F.2d 7, 11 n.3 (1st Cir. 1991) ("Qualified immunity should be denied if the officials were or should have been aware that the prisoner presented a substantial risk of suicide").

For these reasons, the Court will not dismiss any of the claims on the basis of qualified immunity at this juncture.

### e. Municipal Liability for the County or CMC

The only municipality against which Plaintiff is currently asserting § 1983 claims is the County. Under *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658 (1978), "municipalities are responsible only for their own illegal acts, and cannot be held vicariously liable under § 1983 for their employees' actions." *Cash v. Cty. of Erie*, 654 F.3d 324, 333 (2d Cir. 2011) (internal quotation marks omitted). "[T]o establish municipal liability under § 1983, a plaintiff must prove that 'action pursuant to official municipal policy' caused the alleged constitutional injury." *Id.* (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick*, 563 U.S at 61. A "policy" may be established under the following theories:

> (1) a formal policy officially endorsed by the municipality;
> (2) actions taken by government officials responsible for
> establishing the municipal policies that caused the particular
> deprivation in question; (3) a practice so consistent and widespread
> that, although not expressly authorized, constitutes a custom or
> usage of which a supervising policy-maker must have been aware;
> or (4) a failure by policymakers to provide adequate training or
> supervision to subordinates to such an extent that it amounts to
> deliberate indifference to the rights of those who come into contact
> with the municipal employees.

*Brandon v. City of New York*, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010) (citations omitted).

"Where the contention is not that the actions complained of were taken pursuant to a [formal] local policy . . . but rather that they were taken or caused by an official whose actions represent official policy," the court considers whether the official implicated "had final policymaking authority in the particular area involved." *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000). If that inquiry is answered affirmatively, then the actions of the policymaker will lead to liability for the municipality. *Weber v. Dell*, 804 F.2d 796, 803 (2d Cir. 1986) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)) (where Sheriff established county jail policy, county could be held liable for the policy); *cf. Roe v. City of Waterbury*, 542 F.3d 31, 37-38 (2d Cir. 2008) (citing *Jeffes*, 208 F.3d at 57) (the "critical inquiry" is thus "whether the government official is a final policymaker with respect to the particular conduct challenged in the lawsuit") (mayor was not establishing city policy when deciding to sexually abuse children). "[C]onclusory allegations of a municipal custom or practice of tolerating official misconduct are insufficient to demonstrate the existence of such a custom unless supported by factual details." *Kucharczyk v. Westchester Cty.*, 95 F. Supp. 3d 529, 540 (S.D.N.Y. 2015).

Here, Plaintiff alleges municipality liability on that basis that a municipal "custom, policy, or usage can be inferred from evidence of deliberate indifference of supervisory officials," here the Sheriff, "to such abuses." *Iacovangelo v. Corr. Med. Care, Inc.*, 624 F. App'x 10, 13 (2d Cir. 2015); *see also Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 306 (S.D.N.Y. 2015) ("where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a 'deliberate choice,' that acquiescence may 'be properly thought of as a city policy or custom that is actionable under § 1983.'"); *see, e.g., Benacquista v. Spratt*, 217 F. Supp. 3d 588, 601

(N.D.N.Y. 2016) (*Monell* claims plausibly alleged where "plaintiff allege[d] that the [school] [d]istrict's policymaking officials failed to take any meaningful corrective or preventive action despite being repeatedly warned by various teachers, administrators, and at least one parent over the course of the school year about [teacher's] improper and increasingly sexualized misconduct"). The Supreme Court has established that "a final decisionmaker's adoption of a course of action tailored to a particular situation and not intended to control decisions in later situations may, in some circumstances, give rise to municipal liability under § 1983." *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 406 (1997) (quotation marks and citation omitted). Thus, the Court must determine whether, on the basis of Plaintiff's allegations, the Sheriff can be considered a final policymaker concerning the treatment of detainees at the County jail and the County therefore may be potentially liable for his actions based on the situation Mr. Pankey confronted. *See, e.g.*, *Leather v. Ten Eyck*, 2 F. App'x 145, 149 (2d Cir. 2001) (sheriff could be a policymaker for *Monell* purposes).

As Plaintiff alleges the Sheriff has control over the policies at the jail (PAC ¶¶ 3, 184, 193), which is supported by New York law, *see* N.Y. Corr. Law § 500-c ("the sheriff of each county shall have custody of the county jail of such county"), the Court can infer at this stage that the Sheriff is indeed a final policymaker. The required "nexus" between "the sheriff's actions and his job functions" can also plausibly be inferred since the alleged deprivations occurred during a standard intake at the jail. *See Roe*, 542 F.3d at 40.

Moreover, given Plaintiff's allegations that the Sheriff was *directly involved* in transferring Mr. Pankey from the Town Court to the County Jail,[19] his knowledge of Mr.

---

[19] Though the County argues there are no allegation of personal involvement, the Court must accept as true Plaintiff's allegation that Mr. Pankey was transferred into Sheriff Anderson's custody and taken to the jail. (PAC ¶ 63); *see supra* note 13.

Pankey's mental health issues, and his supervision of the County Deputies once Mr. Pankey was held on the warrant, Plaintiff plausibly alleges the Sheriff should have had enough awareness of these issues that it represents "a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees." *Brandon*, 705 F. Supp. 2d at 276-77; *see Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) (holding that a plaintiff "may establish the pertinent custom or policy by showing that the municipality, alerted to the [unconstitutional action by its employees], exhibited deliberate indifference"); *Hines v. Albany Police Dep't*, 520 F. App'x 5, 8 (2d Cir. 2013) (police chief's involvement in allegedly unconstitutional deprivations subjected city to *Monell* liability); *cf. Iacovangelo*, 624 F. App'x at 14 (*Monell* claim properly dismissed where "nothing in the complaint plausibly allege[d] knowledge of th[e] matter on the part of any supervisory personnel"); *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) ("a single incident alleged in a complaint, especially if it involved only actors below the policy-making level, does not suffice to show a municipal policy") (citations omitted); *Perez v. Ponte*, 236 F. Supp. 3d 590 (E.D.N.Y. 2017), *report and recommendation adopted*, No. 16-CV-645 (JFB)(AKT), 2017 WL 1050109 (E.D.N.Y. Mar. 15, 2017) ("with no facts asserting direct involvement by a policymaking official, the actions taken by [] a lower-level employee[] cannot be attributed to the City"). Plaintiff's additional conclusory arguments, however, that the Sheriff implemented, *e.g.*, a fiscally-driven policy to avoid placing guards on 24-hour watch (*see* PAC ¶¶ 184(C), 186-87, 190-93), fail to plausibly allege either the existence of a municipal policy or the Sheriff's involvement.

Therefore, at this stage, Plaintiff plausibly, though only barely, states a claim against the County.[20] The Court agrees with the County that "as [Plaintiff's] claim against [Sheriff Anderson falls, so falls [the] claim against the County." (*See* County Reply at 3.) Whether the Sheriff's personal involvement and notice of Mr. Pankey's condition will be borne out by the record is a question for either summary judgment or trial, which will necessarily impact the claim against the County.

\* \* \*

Plaintiff's federal claims against the individual John Doe officers and deputies of the City, Town, and County, therefore, survive Defendants' motions to dismiss, as do her claims against Sheriff Anderson and the County.

## II. State Claims (Negligence and Wrongful Death)

Plaintiff's common law negligence and wrongful death claims against the Hospital and the law enforcement Defendants stem from the same set of events discussed above. Under New York law, which governs Plaintiff's negligence claims, "[t]o establish a prima facie case of negligence, a plaintiff must establish the existence of a duty owed by a defendant to the plaintiff, a breach of that duty, and that such breach was a proximate cause of injury to the plaintiff." *S.W. ex rel. Marquis-Abrams v. City of New York*, 46 F. Supp. 3d 176, 205 (E.D.N.Y. 2014) (quoting *Nappi v. Inc. Vill. of Lynbrook*, 19 A.D.3d 565, 566 (2d Dep't 2005)). As for her wrongful death

---

[20] Plaintiff has requested that her § 1983 claims against CMC "be deemed withdrawn," (*see* Pl. Opp'n CMC at 1), in recognition that she has failed to plausibly allege such claims. The Court notes with regard to CMC that "[c]orporate entities . . . are treated the same as a municipality when performing the public function of running a jail." *Helijas v. Corr. Med. Care, Inc.*, No. 15 Civ. 1049 (GTS) (DJS), 2016 WL 5374124, at *15 n.20 (N.D.N.Y. Sept. 26, 2016) (citation omitted). The Court also agrees that Plaintiff "has not alleged facts plausibly suggesting 'a sufficiently widespread practice among' CMC employees generally, or at the Jail in particular, to support the conclusion that insufficient screening and supervision of detainees with respect to medical and/or mental health problems was a custom of which CMC supervisory personnel was aware." *Id.* at *15. Nor does Plaintiff's alternative pleading scheme—substituting CMC for the Sheriff's office—suffice to establish liability on the part of CMC without similar allegations that a supervisor within CMC, like the Sheriff within the Sheriff's office, was knowledgeable of and directly involved in the treatment of Mr. Pankey's mental condition.

claims, "the essence of the cause of action for wrongful death in [New York] is that the

plaintiff's reasonable expectancy of future assistance or support by the decedent was frustrated

by the decedent's death." *Gonzalez v. New York City Hous. Auth.*, 77 N.Y.2d 663, 668, 572

N.E.2d 598, 601 (1991); *see also Chong v. New York City Transit Auth.*, 83 A.D.2d 546, 547 (2d

Dep't 1981) (in addition to an actionable negligence claim, a claim seeking recovery for

wrongful death as a result of such negligence also requires "the death of a human being," "the

survival of distributees who suffered pecuniary loss by reason of the death of decedent," and "the

appointment of a personal representative of the decedent").

There is no question that "negligent tort-feasors may be liable for the wrongful death, by

suicide, of a person injured by their negligence." *Fuller v. Preis*, 35 N.Y.2d 425, 427 (1974).

Therefore, if Mrs. Case, Mr. Pankey's grandmother and the administratrix of his estate, pleads a

plausible negligence claim, then she may also assert a claim for wrongful death so long as she

has suffered a pecuniary loss as a result of his passing. Here, however, "[P]laintiff has neither

alleged nor presented evidence that she—or any other person—suffered pecuniary loss as a result

of [Mr. Pankey's] death." *Singleton v. City of Newburgh*, 1 F. Supp. 2d 306, 317 (S.D.N.Y.

1998). Thus, the Court must dismiss the wrongful death portion of her negligence claims,

though without prejudice to amend to allege or offer proof of such a loss. *See, e.g.*, *id.*

(grandmother-administratrix granted leave to demonstrate such a loss where other elements of a

wrongful death claim were alleged).

As for her underlying negligence claims, when the alleged negligence involves "the

failure to prevent a suicide" by a facility, such as a hospital, failing "to detect suicidal

tendencies" despite being tasked with "car[ing] for the person's well-being" or if a jail "fails to

take reasonable steps to prevent a reasonably foreseeable suicide" when it has "actual physical

custody of an individual." *Cygan v. City of New York*, 165 A.D.2d 58, 67 (1st Dep't 1991). The Court addresses the former with regard to the Hospital and the later with respect to the law enforcement agencies.

### a. Hospital

A hospital must use "reasonable care in the care of the patient," here Mr. Pankey, "pursuant to the psychiatrists' directions[.]" *Lichtenstein v. Montefiore Hosp.*, 56 A.D.2d 281, 284 (1st Dep't 1977). The "reasonableness" of that care is "to be judged relative to all the circumstances, including the foreseeability and severity of the actual risk of suicide in the medical judgment of the psychiatrists." *Id.* This includes "the patient's physical and mental ills and deficiencies as known to the officers and employees of the institution." *Zajaczkowski v. State of New York*, 189 Misc. 299, 302 (Ct. Cl. 1947). In sum, the duty of reasonable care owed to a mental patient by a mental health facility includes, as relevant here, protection from foreseeable risks of suicide and other known risks, as well as reasonably competent care in accordance with the treating psychiatrist's decisions.

Once the Hospital determined that Mr. Pankey needed in-patient services and monitoring, its duty of care encompassed his remaining at the facility, which included guarding Mr. Pankey from his own machinations for escape of which the facility was aware. *See, e.g.*, *Shattuck v. State*, 166 Misc. 271, 274 (Ct. Cl.), *aff'd*, 254 A.D. 926 (4th Dep't 1938) ("The State was forewarned by the first escape and should have taken proper measures to prevent the second[;] [in] [f]ailing to do so, it was guilty of negligence"); *Martindale v. State*, 269 N.Y. 554, 554 (1935) (finding of negligence warranted where hospital "knew that the deceased, while a patient in the hospital, was possessed of a desire and propensity to escape[,] [and] that on a previous occasion she had escaped through a similar window" yet left her sufficiently unguarded that she

"removed a lug from the window of the toilet room through which she escaped," falling or jumping to her death); *see also Huntley v. State*, 62 N.Y.2d 134, 137 (1984) (psychiatric hospital "failed in its duty to supervise its patient adequately, leading to her injury," when staff members did not adequately share safety concerns with staff psychiatrist or take measures to secure patient's physical safety); *Miltz v. Ohel, Inc.*, 165 Misc. 2d 167, 170 (Sup. Ct. Nassau Cty. 1995) ("The duty to exercise reasonable care to restrain, and supervise [individual suffering from mental disorder] to prevent him from injuring himself or others was on the group home where he had resided for six years prior to the subject incident").

"Whether a breach of duty has occurred depends upon whether the resulting harm was a reasonably foreseeable consequence of the defendant's acts or omissions." *Gordon v. City of New York*, 70 N.Y.2d 839, 841 (1987). "Certainly suicide is within the realm of foreseeable consequences for a delusional patient even where there is no evidence of such ideations." *Bell v. New York City Health & Hosps. Corp.*, 90 A.D.2d 270, 284 (2d Dep't 1982). But, based on the facts alleged, it was also foreseeable that Mr. Pankey would attempt to escape from the Hospital in the manner alleged.

The Hospital was aware the Mr. Pankey did not want to take his medication and had already attempted to flee from the unit in contravention of the decision to keep him as an in-patient. (*See* PAC ¶¶ 29, 36.) Nevertheless, the Hospital allegedly did little to guard against the chance that he would "push past" a nurse stationed at the exit—a known risk. *Compare Martindale*, 269 N.Y. at 554 (left patient unguarded despite known risk of escaping through windows), *and Shattuck*, 166 Misc. at 274 (failed to take steps to prevent a second, similar to the first, escape), *with Lichtenstein*, 56 A.D.2d at 283-84 ("a patient dressed in street clothes like visitors [], and intent on leaving the unit, could slip through the unlocked door without any

negligence on the part of the hospital," where patient was in an open psychiatric unit), *Paradies v. Benedictine Hosp.*, 77 A.D.2d 757, 758 (3d Dep't 1980) (not negligent to allow a patient who was voluntarily admitted to later discharge himself after a finding that he was not a danger to himself or others), *and Hirsh v. State of New York*, 8 N.Y.2d 125, 126-27 (1960) ("Nobody knew where or how [a] drug was obtained by [the patient] nor where he had kept or accumulated these capsules in his room," making patient's overdose an unforeseeable event); *see also cf. Dunn v. State*, 29 N.Y.2d 313, 317 (1971) ("the State," which ran the institution in question, "should have foreseen, in the person of [the escapee]—a man with a history of violence and criminal behavior—a hazard to be guarded against," leading the court to conclude the institution had breached its duty "to protect the public").

The Court recognizes that sometimes a nurse is simply "a nurse, not a sentinel," *Lichenstein*, 56 A.D.2d at 283, but Mr. Pankey required in-patient care and was not housed in an open unit. Moreover, once he had escaped, the Hospital issued an order *confirming* that he was a danger to himself and others.[21] Therefore, on the basis of the facts alleged in the complaint, Plaintiff has plausibly alleged that the Hospital was negligent—that it breached its duty of care as "measured by the patient's physical and mental ills and deficiencies as known to the officers and employees of the institution"—when it failed to prevent Mr. Pankey from leaving.[22] *See Zajaczkowski*, 189 Misc. at 302; *Cygan*, 165 A.D.2d at 67 (liability may exist "where an

---

[21] These potentially negligent acts highlight the degree to which the claims asserted in this action overlap, *i.e.*, a determination of exactly what steps the Hospital undertook to inform the City, Town, and/or Sheriff will inform the inquiry as to those Defendants' potential deliberate indifference to Mr. Pankey's mental condition.

[22] Plaintiff also alleges the Hospital should have ordered Mr. Pankey involuntarily committed (PAC ¶ 33), but on the basis of the allegations, the Court cannot infer that such a commitment would have been permissible, *see, e.g.*, *Paradies v. Benedictine Hosp.*, 77 A.D.2d 757, 758-59 (3rd Dep't 1980) ("decedent was admitted as an informal patient under section 9.15 [of the Mental Hygiene Law], and, therefore, . . . had the right to leave the hospital once he demanded his discharge"), making it impossible to infer the alleged failing could be negligent. Nevertheless, Plaintiff does plausibly allege additional negligence on the part of the Hospital when it failed to adequately inform all local law enforcement agencies of the issued Mental Hygiene order.

44

institution or mental health professional . . . with the control necessary to care for the person's well-being fails to take such steps").

### b. Municipalities and Law Enforcement Officers

"When a negligence claim is asserted against a municipality or its employees, the threshold inquiry is 'whether the municipal entity was engaged in a proprietary function or acted in a governmental capacity at the time the claim arose.'" *Velez v. City of New York*, 730 F.3d 128, 134 (2d Cir. 2013) (quoting *Applewhite v. Accuhealth, Inc.*, 21 N.Y.3d 420, 425 (2013)). If the State is "engage[d] in a proprietary function, such as providing medical and psychiatric care . . . , the State is held to the same duty of care as private individuals and institutions engaging in the same activity[.]" *Schrempf v. State of New York*, 66 N.Y.2d 289, 294 (1985); *Sebastian v. State*, 93 N.Y.2d 790, 793 (1999) ("proprietary functions" are those "in which governmental activities essentially substitute for or supplement 'traditionally private enterprises'"). Running a jail or arresting an individual suspected of a crime, however, is prototypically governmental in nature. *See Villar v. Howard*, 28 N.Y.3d 74, 80-81 (2016) (without specifically addressing functional considerations, the Court of Appeals implied claims against a municipality and its employees related to its jail involved governmental functions); *see also Eddy v. Vill. of Ellicottville*, 35 A.D. 256, 262 (4th Dep't 1898) (though governments are no longer absolutely immune, "it has been held that the duty and function of keeping a jail are plainly and properly governmental in character").

Where the State, or a municipality, is engaged in a governmental function—"when its acts are undertaken for the protection and safety of the public pursuant to the general police powers," *Applewhite*, 21 N.Y.3d at 425—two considerations arise. First, to be subject to liability the government must owe the plaintiff a "special duty" beyond that owed to the general public.

*Velez*, 730 F.3d at 135; *Graham v. City of New York*, 136 A.D.3d 747, 748 (2d Dep't 2016) (a "special duty is a duty to exercise reasonable care toward the plaintiff, and is born of a special relationship between the plaintiff and the governmental entity") (quotation marks and citations omitted). Second, a determination as to whether the governmental function was discretionary or ministerial is required. This is because in New York "the common law doctrine of governmental immunity continues to shield public entities from liability for discretionary actions taken during the performance of governmental functions," as opposed to those acts which are "essentially clerical or routine[.]" *Valdez v. City of New York*, 18 N.Y.3d 69, 75-76, 79 (2011). "[W]hen both of these doctrines are asserted in a negligence case, the rule that emerges is that '[g]overnment action, if discretionary, may not be a basis for liability, while ministerial actions may be, but only if they violate a special duty owed to the plaintiff, apart from any duty to the public in general." *Id.* (quoting *McLean v. City of New York*, 12 N.Y.3d 194, 203 (2009)).

Addressing the first part of the test applicable to governmental actions, it is well-established in New York that when the State "assume[s] physical custody of inmates [or detainees], who cannot protect and defend themselves in the same way as those at liberty can, the State owes a duty of care to safeguard" those individuals from harm. *See Sanchez v. State of New York*, 99 N.Y.2d 247, 252 (2002) (considering harm from other inmates); *Gordon*, 70 N.Y.2d at 840 ("a duty of care is owed by prison authorities with respect to the health and safety of their charges") (considering duty to protect an arrestee from self-harm). The special relationship between the State and a pretrial detainee differs from the usual case where courts are "asked to impose liability on the government because it failed to prevent the acts of third persons who are the primary wrongdoers," *see Pelaez v. Seide*, 2 N.Y.3d 186, 205-06 (2004), because "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's

predicament or from its expression of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *DeShaney*, 489 U.S. at 200; *see also Bailey v. Tricolla*, No. 94 Civ. 4597 (CPS), 1996 WL 733078, at *3 (E.D.N.Y. Dec. 11, 1996) ("Special relationships that . . . give rise to a [constitutional] governmental duty to protect [] have included . . . the relationship between a police officer and a pretrial detainee.").

This recognized special duty on the part of officers and detainees, jails and jailers, does not mean, however, that all negligent acts undertaken during the care of a pretrial detainee will result in liability. It will, at some point, be necessary to determine whether the activity was ministerial or discretionary, since the former will render the governmental immunity defense inapplicable while the latter will compel its immunizing force. Nevertheless, having determined that as a matter of law municipalities and their employees owe a special duty of care to detainees, the defense turns on questions of fact which are not appropriately determined at the motion to dismiss stage. *See Villar*, 28 N.Y.3d at 80-81 (party asserting governmental immunity, an affirmative defense, bears burden of proof, precluding resolution of issue at the pleading stage).[23]

Upon this background, the Court turns to addressing whether the law enforcement officers or their respective municipalities breached the duty of care owed to Mr. Pankey. Although "a duty of care is owed by prison authorities with respect to the health and safety of their charges," *Gordon*, 70 N.Y.2d at 840, "the State's duty to prisoners does not mandate unremitting surveillance in all circumstances, and does not render the State an insurer of inmate

---

[23] Another court in this District has recently had occasion to consider the application of governmental immunity to jailer's alleged negligence, similarly concluding at the summary judgment stage that disputed questions of fact required the fact finder to determine whether the government was exercising ministerial or discretionary authority in particular aspects of the operation of a jail. *See Torres v. City of New York*, No. 09 Civ. 9357 (LGS), 2017 WL 2191601, at *5 (S.D.N.Y. May 17, 2017) ("If the jury finds that the City did owe [detainee] a special duty and that the City's conduct was unconstitutional, then the affirmative defense of governmental immunity is unavailable as a matter of law as the City's conduct was ministerial."); *id.* at *4 (concluding "City officials lack discretion to violate the governing rules set forth by the United States Constitution").

safety." *Sanchez*, 99 N.Y.2d at 256. "[T]he scope of the State's duty to protect inmates is limited," as in all negligence actions, "to risks of harm that are reasonably foreseeable." *Id.* at 253. Yet "foreseeability is defined not simply by actual notice *but by actual or constructive notice*[.]" *Id.* at 255 (emphasis added). The Court thus returns to the question of whether these officers "fail[ed] to take reasonable steps to prevent a reasonably foreseeable suicide" while having "actual physical custody" of him. *Cygan*, 165 A.D.2d at 67.

### i. City & Town Officers

"When [] authorities know or should know that a prisoner has suicidal tendencies or that a prisoner might physically harm himself, a duty arises to provide reasonable care to assure that such harm does not occur." *Gordon*, 70 N.Y.2d at 840. Since the Court has already determined that the allegations plausibly support an inference that the officers were reckless—or deliberately indifferent—with regard to Mr. Pankey's mental health needs, Plaintiff has sufficiently alleged they were potentially negligent, or grossly negligent, in their handling of his arrest and transfer in light of their knowledge of the Mental Hygiene order. The City and Town Officers, therefore, breached their respective duties to provide Mr. Pankey with reasonable care to ensure he did not physically harm himself.[24]

### ii. Sheriff & Deputies

"Inasmuch as 'the Sheriff is [similarly] prescribed, by law, to safely keep inmates of the County Jail,'" the "duty of care to safeguard inmates" is equally applicable to Sheriffs, Deputies, and Counties. *See Villar*, 28 N.Y.3d at 80; *Stevens v. Dutchess Cty.*, 445 F. Supp. 89, 93-94 (S.D.N.Y. 1977) (findings "alleg[ations] [of] gross negligence on the part of the sheriff in

---

[24] The City concedes the allegations could amount to negligence. (*See* City Mem. at 6 ("At most, mere negligence is alleged."); *id.* at 8 (focusing on proximate cause rather than the allegedly breached duty of care).)

maintaining and supervising [a] jail in violation of his duty of care" actionable).[25]  A Sheriff

cannot, however, be held vicariously liable for deputies' negligent acts committed while

performing criminal justice functions, *see Barr v. Albany County*, 50 N.Y.2d 247, 257 (1980),

such as "'guarding prisoners' in a county jail[.]" *Trisvan v. County of Monroe*, 26 A.D.3d 875,

876 (4th Dep't 2006) (quoting *Wilson v. Sponable*, 81 A.D.2d 1, 4 (4th Dep't 1981)); *see also*

*D'Amico v. Corr. Med. Care, Inc.*, 120 A.D.3d 956, 959 (4th Dep't 2014) ("a Sheriff cannot be

held personally liable for the acts or omissions of his deputies while performing criminal justice

functions, and that this principle precludes vicarious liability for the torts of a deputy").  The

County employees, therefore, each had an individual duty to use reasonable care to prevent

inmate harm, including when conducting the screening per their usual practices.

The Court has already determined that the law enforcement Defendants—including the

Sheriff personally—acted with at least recklessness with regard to Mr. Pankey's mental health

issues.  Thus, these individual acts and omissions constitute breaches of their respective duties of

care owed to Mr. Pankey.[26]  It may be that at summary judgment the record will not support a

finding that the law enforcement officers knew or should have known that Mr. Pankey was a risk

to his own well-being, making his suicide unforeseeable.[27]  *Moore v. City of Troy*, 179 A.D.2d

842, 843 (3d Dep't 1992) (where "unruly behavior" could not be viewed as "manifestation of

---

[25]  Though Plaintiff need not "allege that [the Sheriff] was present and failed to prevent the [harm] [to Mr. Pankey], or had specific prior knowledge that [Mr. Pankey] was particularly vulnerable to [self-harm]," here she has done just that, making the allegations more than sufficient to withstand a motion to dismiss. *See Villar v. Howard*, 28 N.Y.3d 74, 80-81 (2016).

[26]  Plaintiff's allegations that the Sheriff's office employees were also negligent in failing to provide Mr. Pankey with the medication necessary to control his disorder, (PAC ¶¶ 96, 132), however, are conclusory as they assume that jail should have been aware he needed such medication.  Such allegations, therefore, cannot support her negligence claims.

[27]  The County essentially concedes, additionally evidenced by its lack of argument to the contrary, that the allegations in this matter may amount to negligence.  (*See* County Mem. at 6 ("The case against the County belongs in state court based upon Plaintiff's negligence theories").)

suicidal tendencies," evidence presented at trial was "insufficient to establish that defendant knew or should have known that decedent would harm himself"); *Mayo v. Cty. of Albany*, No. 07 Civ. 0823 (GLS) (DRH), 2009 WL 935804, at *5 (N.D.N.Y. Apr. 3, 2009), *aff'd*, 357 F. App'x 339, 343 (2d Cir. 2009) (an entirely conclusory assertion that plaintiff was a suicide risk was insufficient to defeat summary judgment, where all other evidence indicated that "defendants could not have reasonably perceived the risk that [detainee] would attempt suicide nor c[ould] it be said that defendants acted unreasonably by not treating her as a suicide risk"); *but see Black v. City of Schenectady*, 21 A.D.3d 661, 662 (3d Dep't 2005) (jury considered whether placing arrestee on active watch rather than constant supervision was negligent despite little to no indication that detainee was at risk of suicide).

But at this juncture, Plaintiff has plausibly alleged that each set of officers, deputies, and the Sheriff breached their respective duties to safeguard Mr. Pankey from the known, or apparent, risk of self-harm. *See Cygan*, 165 A.D.2d at 67; *Gordon*, 70 N.Y.2d at 840; *cf. Fischer v. City of Elmira*, 75 Misc. 2d 510, 513 (Sup. Ct. Chemung Cty. 1973) (where complaint alleged failure to make a proper examination and failure to provide, as requested, adequate medication on the part of city and county, plaintiff alleged negligence including the "reasonable inference [of] a failure to take proper medical precautions to guard the plaintiff, a known epileptic, from causing injuries to himself").

### iii.   City & Town Municipal Liability

"[I]n contrast to claims brought under 42 U.S.C. § 1983, *respondeat superior* liability does apply to claims brought under New York state law" against municipalities. *Aponte v. City of New York*, No. 14 Civ. 3989 (KMK), 2016 WL 5394754, at *7 (S.D.N.Y. Sept. 26, 2016) (collecting cases); *Poniatowski v. City of New York*, 14 N.Y.2d 76, 82 (1964) ("municipalities

have been repeatedly held liable on a master and servant basis for every variety of negligence by its policemen").  In this fashion, municipalities have been held liable for the acts of their jailers—for example, in the case of a man, arrested and held in a village jail, dying from pneumonia as a result of negligent exposure and failure to treat his medical injury.  *See, e.g.*, *Dunham v. Vill. of Canisteo*, 303 N.Y. 498, 503 (1952) ("the village authorities were under a duty to obtain medical care for the deceased").[28]  Thus, the City and the Town may be held liable for the acts of their officers, if the eventual record supports a finding that they were acting within the scope of their employment.  "Because the question of whether an officer's actions 'were committed within the scope of his public employment and the discharge of his duties raises factual questions,' such inquiries often survive motions for summary judgment, let alone motions to dismiss."  *Guzman v. United States*, No. 11 Civ. 5834 (JPO), 2013 WL 543343, at *9 (S.D.N.Y. Feb. 14, 2013) (quoting *Williams v. City of New York*, 64 N.Y.2d 800, 802 (1985)), *on reconsideration*, 2013 WL 5018553 (S.D.N.Y. Sept. 13, 2013) (dismissing *Monell* claims).

However, although "an employer may generally be liable for an employee's negligence where the employee is acting within the scope of his or her employment under a theory of *respondeat superior*, [] no claim may proceed against the employer for negligent hiring, retention, supervision or training" on that basis alone.  *Nesheiwat v. City of Poughkeepsie, N.Y.*, No. 11 Civ. 7072 (ER), 2013 WL 620267, at *2 (S.D.N.Y. Feb. 13, 2013) (noting a limited exception where gross negligence in the hiring or retention of an employee is alleged and punitive damages are sought) (citations omitted).  Rather, "a cause of action sounding in negligence is legally sustainable against a [municipality] when the injured party demonstrates

---

[28]  The Court also notes that New York Corrections Law § 24 does not bar claims against a city's correctional employees or claims against the city itself asserted on a *respondeat superior* basis.  *See Plair v. City of New York*, 789 F. Supp. 2d 459, 467 (S.D.N.Y. 2011) (provision applies only to *state* correctional employees).

that he was injured *due to* the negligent training and supervision of a law enforcement officer." *Barr*, 50 N.Y.2d at 257 (citing *Meistinsky v. City of New York*, 285 A.D. 1153 (2d Dep't 1955), *aff'd*, 309 N.Y. 998 (1956)) (emphasis added); *Rew v. Cty. of Niagara*, 115 A.D.3d 1316, 1318 (4th Dep't 2014) (applying principal to defendant sheriff); *Martinetti v. Town of New Hartford Police Dep't*, 307 A.D.2d 735, 736 (4th Dep't 2003) (reinstating claim "alleg[ing] that the Town failed to train and supervise the police properly").

To the extent Plaintiff is asserting policy based claims against the City and the Town, such claims are based on conclusory allegations of "a policy of deliberate indifference to the rights, safety and welfare of [Mr. Pankey]," (*see, e.g.*, PAC ¶ 164), without any specifics alleged other than the failings by the John Doe officers of the respective jurisdictions in the handling of Mr. Pankey's arrest and transfer. Plaintiff neither alleges that the officers occupied a policymaking role within the City nor that they were acting outside of the scope of their employment. These conclusory allegations against the municipalities, therefore, fail to state an independent claim under New York law with regard to supervision or training. *See, e.g.*, *Leftenant v. City of New York*, 70 A.D.3d 596, 597 (1st Dep't 2010) ("since the officers were acting within the scope of their employment, which plaintiff does not dispute, the claim of negligent hiring, training and supervision must also fail"); *cf. Ryan v. Moss*, No. 11 Civ. 6015P (MWP), 2013 WL 956722, at *19 (W.D.N.Y. Mar. 12, 2013) (summary judgment granted in favor of defendants where plaintiff "failed to provide any evidence that the Sheriff Office's manner or practice of training and supervising [employees] was deficient or inadequate"); *Scott v. City of Mount Vernon*, No. 14 Civ. 4441 (KMK), 2017 WL 1194490, at *32 (S.D.N.Y. Mar. 30, 2017) (same).

###### iv.   County Liability

Counties, however, are treated differently under New York law.  Absent a legislative assumption of responsibility, a county cannot be held liable on the theory of *respondeat superior* for the negligent acts of either the Sheriff or Sheriff's deputies.  *Marashian v. City of Utica*, 214 A.D.2d 1034, 1034 (4th Dep't 1995) ("The 1989 amendment to the New York Constitution, article XIII, § 13(a) merely allows a county to accept responsibility for the negligent acts of the Sheriff; it does not impose liability upon the county for the acts of the Sheriff or his deputies on a theory of *respondeat superior*"); *D'Amico*, 120 A.D.3d at 959.  Thus, only specific allegations relating to the County's "negligent training and supervision" of its law enforcement officers will state a claim against the County.  *Cf. Meistinsky*, 285 A.D. at 1153, *aff'd*, 309 N.Y. 998 (1956) ("negligence on the part of [the city], on the theory that the officer had not received sufficient and proper training in the use of small firearms, was established").  Additionally, as mentioned above, the "State's constructive notice—what the State reasonably should have known"—can stem, "for example, from its knowledge of risks to a class of inmates based on the institution's expertise or prior experience, or from its own policies and practices designed to address such risks."  *Sanchez*, 99 N.Y.2d at 254; *see also Wilson*, 81 A.D.2d at 9 ("a scheme [designed to further inmate protection] once drawn up may render the state liable, if carried out negligently").

On the basis of the allegations in the complaint, the Court cannot conclude that the County jail had a duty to employ trained psychologists "to detect suicidal tendencies," rather than the Deputies or CMC employees (*see, e.g.*, PAC ¶ 184(b) (policy demonstrated, *inter alia*, by "not using a medical professional to conduct a suicide screening"))—and thus cannot conclude that the duty owed to Mr. Pankey by the County also included a *more rigorous* suicide screening protocol.  *See* 9 N.Y. Comp. Codes R. & Regs. § 7013.7 (a) & (b)(4-5) ("Each inmate

upon admission to a facility shall undergo an initial screening and risk assessment which shall consist of a screening interview, visual assessment and review of commitment documents. Such screening and risk assessment shall occur immediately upon an inmate's admission," and include areas such as "history of mental illness or treatment" and "potential for self-injury or suicide"); *see, e.g.*, *Burke v. Warren Cty. Sheriff's Dep't*, 916 F. Supp. 181, 186 (N.D.N.Y. 1996) (court determined that the county, despite having undertaken to install surveillance cameras, was not under a duty to keep them continually operational).

As discussed above, however, Plaintiff has plausibly alleged the Sheriff was involved in the alleged acts and omissions such that a reasonable inference exists that he failed to properly train or supervise the County Deputies with regard to the proper treatment and screening of pretrial detainees, which also plausibly alleges County acquiescence in such a policy. *Cf. Cash v. Cty. of Erie*, No. 04 Civ. 0182C(F) (JTC), 2007 WL 2027844, at *5 (W.D.N.Y. July 11, 2007) (denying summary judgment on negligence claims where genuine issue of fact existed with regard to whether sheriff failed to properly train deputy in question). Because Plaintiff has alleged a degree of personal involvement by the Sheriff which allows both the inference that the Sheriff himself was negligent and the inference that he failed to supervise and to train his Deputies during the time when Mr. Pankey was held at the jail, the claims against the County cannot be dismissed at this juncture.

With regard to CMC, although § 1983 claims would fail if asserted against it (*see supra* note 20), Plaintiff's alternative pleading suffices at this stage to allege CMC may be liable for negligent acts of its employees. CMC employees, acting within the scope of their employment, are alleged to have taken part in the care of Mr. Pankey. Exactly which employees—County Deputies or CMC personnel—were involved in Mr. Pankey's treatment is wholly within the

knowledge of the County and CMC. The Court notes that CMC's arguments for dismissal centered solely on Plaintiff's constitutional claims (*see* CMC Mem. at 1, 6), implying a tacit acceptance that if those claims were not dismissed then the state law negligence claims would proceed. (*See id.* at 4 ("it is implied that unnamed CMC employees were negligent").) Therefore, the negligence claims asserted against CMC survive.

### c. Questions of Causation

"A defendant's negligence qualifies as a proximate cause where it is 'a substantial cause of the events which produced the injury.'" *Mazella v. Beals*, 27 N.Y.3d 694, 706 (2016) (quoting *Derdiarian v. Felix Contr. Corp.*, 51 N.Y.2d 308, 315 (1980)). As the New York Court of Appeals has made clear: "it is rather obvious[] that there never can be a sole cause for suicide." *Fuller*, 35 N.Y.2d at 433. Instead, the issue is "whether the defendants' negligence *substantially contributed* to [the decedent's] death." *Id.* (emphasis added). And while "there may be and undoubtedly have been cases where the causal nexus becomes too tenuous to permit a jury to 'speculate' as to the proximate cause of [a] suicide," *id.* at 434, this is not such a case. *See, e.g.*, *Paradies*, 77 A.D.2d at 758 (no evidence was presented to establish a causal connection between the alleged acts of negligence and the subsequent suicide, which occurred approximately three weeks after the decedent's release from the hospital); *cf. Mroz v. City of Tonawanda*, 999 F. Supp. 436, 458-61 (1998) (no causal connection existed between alleged failure to protect a minor's suicide, where he was arrested by police, cried continuously while in custody, and was then released and taken home less than one hour later); *Van Valkenburgh v. Robinson*, 225 A.D.2d 839, 840-41 (3d Dep't 1996) (alleged negligence of village police and officer—allowing wife of officer to gain access to officer's service weapon—was not the proximate cause of wife's suicide, an intentional intervening act that was not reasonably

foreseeable as a result of such negligence); *Watkins v. Labiak*, 282 A.D.2d 601, 602 (2d Dep't 2001) ("suicide was not a foreseeable consequence of the defendants' alleged negligence," medical malpractice during a back surgery).

Rather, as to each set of Defendants, there were opportunities at each juncture to avoid the harm which occurred. The escape and then transfer from jurisdiction to jurisdiction does not sever the causal link at each step; instead, it demonstrates the potential for a number of actors to exhibit similar negligence for which they may ultimately be liable. *See Mazella*, 27 N.Y.3d at 706 ("The mere fact that other persons share some responsibility for plaintiff's harm does not absolve defendant from liability because 'there may be more than one proximate cause of an injury.'") (citation omitted); *Bell*, 90 A.D.2d at 285 ("an "intervening act must be a new and independent force, for it is well settled that a defendant will not be relieved of liability where the intervening act was set in motion by the defendant's own wrongful acts").

With regard to the Hospital:

> If the danger (from the patient's leaving) foreseen and to be guarded against by the hospital was suicide and the hospital failed to use reasonable care — reasonable being determined in the light of the circumstances discussed above — to safeguard the patient against escape and suicide, and if as a result of that lack of reasonable care, the patient escaped and suffered the very harm foreseen and to be guarded against — suicide — then the jury could reasonably find that the hospital's negligence was a proximate cause of the suicide.

*Lichtenstein*, 56 A.D.2d at 285. Despite arguing that Mr. Pankey's "elopement did not cause or trigger the acts or omissions of the municipal defendants as alleged in the complaint," (*see* Hosp. Reply at 3), which may be true, the Hospital ignores that the alleged negligence may have substantially contributed to putting Mr. Pankey into harm's way—such that the very harm to be protected against was realized.

Thus, the Hospital's attempt to analogize this situation to the one presented in *Dunn v. State*, 29 N.Y.2d 313 (1971), involving claims brought by the estate of an innocent bystander, is unavailing, and Mr. Pankey's escape, brought about by the Hospital's alleged negligence, more closely resembles the attempted suicide in *Bell v. New York City Health & Hosps. Corp.*, 90 A.D.2d 270 (2d Dep't 1982), where a patient committed suicide after the treating hospital was negligent. *Compare Dunn*, 29 N.Y.2d at 317 (when escapee found keys in a car and eventually crashed into an unsuspecting driver, "[t]hese were intervening causes which brought about the death of [the driver] and consequently, because of this break in the chain of causation, the [institution's] negligence was not the proximate cause of the injuries complained of"), *with Bell*, 90 A.D.2d at 285 (suicide "was a product of the illness for which [the patient] was negligently treated, and his premature release from the hospital."). The duty allegedly breached was owed directly to Mr. Pankey (as in *Bell*) not a third-party (like the bystander in *Dunn*), and the breach of that duty was to *his* detriment (again, as in *Bell*).

Moreover, when the intervening acts are "but part of a continuum of events initiated by the defendants' original misconduct," *id.* at 286, the acts which follow will not sever the causal chain, though they may contribute to the ultimate injury. *See also Derdiarian*, 51 N.Y.2d at 315 ("[b]ecause questions concerning what is foreseeable and what is normal may be the subject of varying inferences, as is the question of negligence itself, these issues generally are for the fact finder to resolve"). Thus, it cannot be decided at the motion to dismiss stage whether the City and the Town, their actions and inactions, "substantially contributed" to Mr. Pankey's eventual demise, though the Court notes that on the basis of the allegations, they certainly could have. The City's attempt to rely on *Dunn* to defeat causation as a matter of law (*see* City Mem. at 9) is similarly unavailing, since it allegedly breached its own independent duty of care and that breach

led to the harm it was supposed to protect against.  Nor can the Town absolve itself "[e]ven if [it] breached a duty by delivering [Mr. Pankey] to the court" by pointing out that, afterwards, he was "arraigned and lawfully remanded into the custody of Dutchess County."  (*See* Town Mem. at 14.)  Such a transfer does not constitute a "new and independent force," *Bell*, 90 A.D.2d at 285, but instead continues the chain of events set into motion by the Hospital—and continued by the City and again by the Town.  *See Derdiarian*, 51 N.Y.2d at 316 ("An intervening act may not serve as a superseding cause, and relieve an actor of responsibility, where the risk of the intervening act occurring is the very same risk which renders the actor negligent.").  And the County and CMC, the final set of allegedly negligent tort-feasors, rightly do not argue the impossibility that the claimed negligence contributed to Mr. Pankey's death.  (*See, e.g.*, County Reply at 5 ("This case presents common law negligence issues with respect to [] the claims . . . that his care, once at the jail, was inadequate.").)

Therefore, at this stage, it is not purely speculative as a matter of law to conclude that the Defendants may have each substantially contributed to this unfortunate outcome.

\*    \*    \*

This case, as alleged, does not involve "an ingenious and motivated patient" that simply could not be stopped.  *See Hirsh*, 8 N.Y.2d at 127 ("An ingenious patient harboring a steady purpose to take his own life cannot always be thwarted.").  Rather, Mr. Pankey appears to have been a mental health patient that needed monitoring but instead, after an alleged breach of a duty of care, ran free.  He was then allegedly subjected to deliberate indifference when he was arrested and detained by law enforcement officers.  Each set of officers owed Mr. Pankey the duty "to provide reasonable care to assure that [] harm [resulting from his mental illness] d[id] not occur."  *Gordon*, 70 N.Y.2d at 840.  But Plaintiff has sufficiently pleaded negligent acts and

omissions against the Defendants to plausibly allege that those duties were breached.  Therefore, these claims survive Defendants' motions to dismiss.

### III.    Motion to Amend

Plaintiff's motion to amend only implicated the City Defendants—as the amendments involved the addition of City "John Doe" Officers and, by subsequent letter, a continuation of Plaintiff's negligence causes of action from the Second Amended Complaint (Second Am. Compl. ¶¶ 56-64, 179-86, ECF No. 49), based on the City Officers alleged misconduct under a *respondeat superior* theory.  In response, the City argues that Plaintiff's amendments are too late pursuant to the scheduling order in this case, which set a deadline of September 15, 2016, though admits discovery has been stayed pending the resolution of these motions.  (City Reply at 3.) Because leave to amend would not be futile based on the proposed amendments, this Court must decide whether there was undue delay in seeking leave, whether the proposed amendments are made in bad faith or would unduly prejudice Defendant City, or whether Plaintiff has failed to show "good cause" under Rule 16(b) to amend the scheduling order.

There is no indication from the proposed Third Amended Complaint that the amendments are made in bad faith—in fact, Plaintiff has been conscientious during briefing and withdrawn claims lacking support.  Moreover, the initial scheduling order was issued at the same time that the briefing schedule on the motions to dismiss was set, and Plaintiff served her motion to amend *during* the briefing of the motions to dismiss on September 26, 2016, ten days after the cut-off. Plaintiff's diligence in this regard provides "good cause."  *See Parker*, 204 F.3d at 326.  Finally, there is no indication that *any* of the Defendants—all of whom have been on notice of this action since the Notices of Claim were filed, and all of which took part in the 50-h hearing—would be prejudiced by the amendments.

Leave to amend is, therefore, granted.  Plaintiff's proposed complaint should also formally assert her negligence claim—requested by follow-up letter—against the City and allege any facts regarding pecuniary loss as applicable to the dismissed wrongful death claims.

## IV.    Hospital's Counterclaims

Certain Defendants also sought dismissal of the Hospital's counterclaims for contribution and indemnification.  (*See* CMC Mem. at 7; Town Mem. at 16.)  When the Hospital did not submit a reply to these arguments, CMC further argued that the Hospital had abandoned its claims.  (*See* CMC Reply at 1.)  This ignores, however, that CMC's pre-motion letter (ECF No. 95) did not seek leave to address the Hospital's counterclaims.  Moreover, the Court did not grant such leave when it allowed CMC to file its motion to dismiss Plaintiff's claims alleged against it pursuant to § 1983.  But in any event, under New York law, "contribution may be claimed [] against 'persons who are subject to liability for damages for the same personal injury.'"  *Goldstein v. Consol. Edison Co. of New York*, 115 A.D.2d 34, 41 (1st Dep't 1986).  Therefore, the contribution based counterclaims will not be dismissed at this juncture, given the uncertainty surrounding which Defendants, if any, may ultimately be found liable in this action.

As the Town Defendants correctly explain (*see* Town Mem. at 16), however, contribution is distinct from indemnification:

> Contribution arises automatically when certain factors are present and does not require any kind of agreement between or among the wrongdoers.  Indemnity, on the other hand, *arises out of a contract* which may be express or may be implied in law "to prevent a result which is regarded as unjust or unsatisfactory."

*Rosado v. Proctor & Schwartz, Inc.*, 66 N.Y.2d 21, 24 (1985) (citations omitted and emphasis added).  Because the Hospital has failed to allege the existence of an agreement, implied or otherwise, between it and any of the Defendants (*see* Hosp. Ans. and Counterclaims, ECF No. 105), the indemnification based counterclaims must be dismissed.

## CONCLUSION

For the foregoing reasons, Plaintiff's motion seeking leave to amend her complaint is GRANTED, and Defendants' motions to dismiss are GRANTED in part and DENIED in part. Plaintiff has withdrawn her § 1983 claims against the City and Town, as well as their respective police chiefs. She has also withdrawn her § 1983 claims against CMC. These claims are dismissed. Additionally, Plaintiff has failed to state a claim for wrongful death under New York law, and those claims are dismissed without prejudice with leave to amend. Plaintiff's other claims survive in accordance with this Opinion. On the basis of CMC and the Town's cross-motions to dismiss the Hospital's counterclaims of indemnification, those claims are also dismissed against all Defendants. The Hospital's counterclaims of contribution, however, are not dismissed. The Clerk of the Court is respectfully directed to terminate the motions at ECF Nos. 78, 85, 88, 97, 109 & 114.

Plaintiff shall file the proposed Third Amended Complaint on or before September 18, 2017. The only modifications to the proposed complaint allowed by this Order include a) clarifying which causes of action are asserted directly against the City, and b) adding allegations, if any exist, regarding Plaintiff's loss in support of the dismissed wrongful death claims. Defendants are directed to thereafter file an answers, if any, to the Third Amended Complaint on or before October 16, 2017. The parties are directed to inform Judge McCarthy of this Court's ruling in writing before September 18, 2017.

Dated:   August 25, 2017             SO ORDERED:
         White Plains, New York

NELSON S. ROMÁN
United States District Judge